NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,

v.

ARCH SPECIALTY INSURANCE COMPANY; Aspen Specialty Insurance Company; Commonwealth Insurance Company; Federal Insurance Company; Lexington Insurance Company; Liberty Mutual Fire Insurance Company; Certain Underwriters at Lloyd's of London and Certain London Market Companies Subscribing to Policy Nos. 507/N11NA08240, 507/N11NA08241, 507/NI1NA08242,507/N11NA08244, 507/N11NA08244,507/N11NA08245 and GEP 2944; Maiden Specialty Insurance Company; Maxum Indemnity Company; Navigators Insurance Company; Partner Reinsurance Europe PLC; RSUI Indemnity Company; Steadfast Insurance Company; Torus Specialty Insurance Company; and Westport Insurance Corporation, Defendants.

No. 14–cv–7510 (JSR).

United States District Court, S.D. New York.

Signed July 31, 2015.

Filed Aug. 3, 2015.

Rhonda D. Orin, Daniel John Healy, Marshall Nathan Gilinsky, Anderson Kill P.C., Washington, DC, Peter Alexander Halprin, Anderson Kill P.C., New York, NY, for Plaintiff.

Bruce R. Kaliner, Deanna Marie Manzo, John C. Mezzacappa, Renee M. Plessner, William D. Wilson, Mound Cotton Wollan & Greengrass, Timothy Gerard Church, Bruckmann & Victory, LLP, New York, NY, Jeremiah L. O'Leary, Robert Mitchell Wolf, Finazzo Cossolini O'Leary Meola & Hager, LLC, Morristown, NJ, Catherine A. Mondell, Joseph Gaughan Cleemann, Joshua E. Goldstein, Kathryn E. Wilhelm, Matthew M. Burke, Ropes & Gray LLP, Boston, MA, for Defendant.

## MEMORANDUM

JED S. RAKOFF, District Judge.

This case concerns an insurance coverage dispute between plaintiff National Railroad Passenger Corporation ("Amtrak") and various defendant insurance companies (the "Insurers") that arose in the aftermath of Superstorm Sandy. During the pendency of this action, the parties filed competing motions for summary judgment and the Insurers moved to dismiss Amtrak's demand for consequential

damages resulting from the alleged breaches of the insurance policies. In two bottom-line orders, this Court (1) denied Amtrak's motions requesting that the Court interpret the term "flood" to exclude storm surge and construe the policies to treat separate losses arising indirectly from a common cause as separate "occurrences"; (2) granted the Insurers' motion requesting that the Court find that Amtrak's damages arose only from "flood" and were all part of the same "occurrence"; (3) granted in part and denied in part the Insurers' motion requesting that the Court find that Amtrak was not entitled to coverage for repairs of certain allegedly undamaged property; and (4) granted in part and denied in part the Insurers' motion to dismiss Amtrak's demand for consequential damages. *See* June 24, 2015 Order, ECF Dkt. No. 255; February 13, 2015 Order, ECF Dkt. No. 158.[1] This Memorandum explains the reasons for those rulings.[2]

Pertinent to the resolution of these motions are the following facts and allegations. Amtrak purchased a set of all-risk property insurance from the Insurers, as well as other non-defendant insurers, for the policy period spanning December 2011 to December 2012. *See* Plaintiff's Rule 56.1 Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment Regarding the Flood Sublimit ("Amtrak 12/18/2014 56.1 Statement"), ECF Dkt. No. 104, ¶ 2; *see also, e.g.*, Affidavit of Rhonda Orin, ECF Dkt. No. 105, Ex. 7, Federal Insurance Co. Policy, at 1. The defendant insurers partic-

---

1. The Court, as a result of these rulings, also dismissed as moot the separate motion for summary judgment of defendant Partner Reinsurance Europe plc. *See* June 24, 2015 Order.

2. Shortly after the Court issued its aforementioned Orders and an Order denying reconsideration, *see* June 30, 2015 Order, ECF Dkt.

No. 331, the parties settled all remaining issues and proposed a final judgment that in effect allows appeal from certain of the issues resolved in those Orders and explained in this Memorandum. The Court adopted the proposal and entered final judgment on July 2, 2015.

ipated in one of two layers of the insurance program. Certain insurers issued primary layer policies, which obligated the insurer to provide a portion of the coverage for the first $125 million of any covered losses Amtrak sustained; the remainder issued or reinsured excess layer policies, which required the insurer to pay a portion of covered amounts in excess of $125 million. *See* Defendant–Insurers' Local Rule 56.1 Statement of Facts in Support of Their Motion for Summary Judgment—Application of Flood and Occurrence Provisions ("Insurers' 3/9/2015 56.1 Statement"), ECF Dkt. No. 182, ¶¶ 12–13. Collectively, the insurance policies provided for a maximum of $675 million (excess of a $10 million deductible) in coverage per "occurrence." *Id.* at ¶ 20.

The primary layer policies each contain a sublimit for "flood," a defined term in the policies. The sublimit provides:

> With respect to the perils of flood and earthquake, this Company shall not be liable, per occurrence and in any one policy year, for more than its proportion of $125,000,000. . . . Even if the peril of flood or earthquake is the predominant cause of loss or damage, any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits or aggregates specified in this Clause [ ].

*Id.* ¶ 11. In the policies at issue in the parties' respective summary judgment motions, flood was defined in one of two ways.[3] The majority of the policies defined flood to mean "a rising and overflowing of a body of water onto normally dry land." *Id.* ¶ 7. The Court will refer to this

as the "Majority Definition." A smaller number of policies altered the definition of flood by endorsement to read:

> The term Flood shall mean a temporary condition of partial or complete inundation of normally dry land from
>
> (1) the overflow of inland or tidal waters outside the normal watercourse or natural boundaries
>
> (2) the overflow, release, rising, backup, runoff or surge of surface water; or
>
> (3) The unusual or rapid accumulation or runoff of surface water from any sour[ce].

A Tsunami shall not be considered Flood as defined above[.] *Id.* ¶ 8. The Court will refer to this as the "Minority Definition." Rounding out the flood-related provisions, all policies grouped together "loss by . . . flood" as a "single loss . . . if" (1) "any flood occurs within a period of the continued rising or overflow of any river(s) or stream(s) or other bodies of water and the subsidence of the same within their normal confines" or (2) "any flood results from any tidal wave or series of tidal waves caused by any one disturbance." *Id.* ¶ 6.

On October 29, 2012, while the policies at issue were in effect, Superstorm Sandy made landfall near New York City. Sandy generated a "storm surge" that drove water from the East and Hudson Rivers onto the shore and led to the inundation of Amtrak's tunnels under the East River (referred to as the East River Tunnel or "ERT"), its tunnel under the Hudson River (referred to as the North River Tunnel or "NRT"), and certain other Amtrak

---

**3.** Defendant Westport Insurance Co. issued a policy that defines flood as "surface water, flood waters, waves, tide or tidal waters, sea surge, tsunami, the release of water, the rising, overflowing or breaking of defenses of natural or manmade bodies of water or wind driven water, regardless of any other cause or [e]vent contributing concurrently or in any other sequence of loss." Insurers' 3/9/2015 56.1 Statement ¶ 9. Amtrak does not dispute that this definition covers at least some of the damages it sustained during Superstorm Sandy.

property.[4] *See* Insurers' 3/9/2015 56.1 Statement ¶¶ 26–30; Plaintiff's Local Rule 56.1 Counterstatement of Facts in Opposition to Insurers' Motion for Summary Judgment—Application of Flood and Occurrence Provisions ("Amtrak 3/30/2015 56.1 Counterstatement"), ECF Dkt. No. 191, ¶ 51. The water in the tunnels, as well as in other properties, "damaged various types of [Amtrak's] equipment." Amtrak 3/30/2015 56.1 Counterstatement ¶ 53.

After the storm subsided, Amtrak undertook to pump the water out of the tunnels. *Id.* ¶ 55. Each tunnel consists of multiple "tubes" through which trains run. *Id.* ¶ 51. Amtrak removed the water from the South Tube in the NRT by November 1, but the water was not pumped out of the three other inundated tubes—the North Tube in the NRT and two of the four tubes in the ERT—until November 4. Declaration of Glenn Sullivan ("Sullivan Decl."), ECF Dkt. No. 196, ¶ 11. The process, which removed millions of gallons of water from the tunnels, left behind "chlorides" from the brackish water. Amtrak 3/30/2015 56.1 Counterstatement ¶ 55. At other locations, specifically, "at 11th Avenue" and at a "fan plant" in Long Island City, Amtrak removed the chlorides from its property, Declaration of Evan P. Lestelle ("Lestelle Decl."), ECF Dkt. No. 181, Ex. A, Deposition of Cathy H. Rawlings ("Rawlings Dep."), at 154:7–18, but it did not remove the chlorides from the ERT and NRT. Amtrak 3/30/2015 56.1 Counterstatement ¶ 55.

The chlorides that remained in the tunnels then allegedly combined with the surrounding environment to cause additional damage in what Amtrak describes as a "chloride attack." *See id.* ¶ 56. According to Amtrak, "the damage process" brought about by the chloride attack "requires a combination of chlorides, humidity and oxygen." *Id.; see also id.* ¶ 41 ("[T]he damage process requires a combination of steel, chlorides, humidity and oxygen."). One of Amtrak's experts explained the damage process as follows: "The salt [chlorides] in the presence of moisture and oxygen will cause corrosion of the rebars and . . . as a result, there would be expansion of the rebar, of the metal, and that will put significant stresses on the concrete and it will cause the concrete to spall." Declaration of Marshall Gilinsky ("Gilinsky Decl."), ECF Dkt. No. 221, Ex. Q, Deposition of Nasri Munfah, at 252:25–253:7. Moreover, because the attack occurred only once the chlorides were "exposed to oxygen in a humid environment," it was not possible for this damage to occur until Amtrak removed the water from the tunnels. Amtrak 3/30/2015 56.1 Counterstatement ¶ 61; *cf. also* Declaration of Michael Thomas, ECF Dkt. No. 194, ¶ 11 ("[S]teel-reinforced concrete that is continuously submerged in sweater (*e.g.*, pilings at the end of an oceanfront pier) will not deteriorate from chloride attack in that environment.").

As part of the subsequent process of assessing its damages, Amtrak engaged experts to recommend repairs to the tunnels. Two of the proposed repairs for which Amtrak now seeks coverage are relevant to the instant motions. First, Amtrak seeks to replace the existing track

---

**4.** The parties agree that " 'storm surge' is 'the rise and on-shore surge of sea water as the result primarily of the winds of the storm and secondarily of the surface pressure drop near the storm center.' " Defendant–Insurers' Memorandum of Law in Support of Their Motion for Summary Judgment—Application of Flood and Occurrence Provisions, ECF Dkt. No. 179, at 9 (quoting Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment Regarding the Flood Sublimit ("Amtrak 12/18/2014 Br."), ECF Dkt. No. 100, at 12 n. 29).

bed in each tunnel—which allegedly incurred or will incur chloride damage—with a "direct fixation" system. *See* Plaintiff's Local Rule 56.1 Counterstatement of Facts in Opposition to Insurers' Motion for Partial Summary Judgment Regarding Replacement of Benchwalls and Track Bed ("Amtrak's Benchwalls/Track Bed 56.1 Counterstatement"), ECF Dkt. No. 190, ¶ 47. While the existing track bed "necessarily" produces an "uneven walkway surface," direct fixation, which "lay[s] the rails in a concrete bed instead of ballast," "would create a continuous, level walking surface in the event of an emergency." Declaration of Joseph Rago, ECF Dkt. No. 195, ¶ 8. Second, Amtrak seeks to replace the entirety of the benchwalls within the tunnels. Amtrak's Benchwalls/Track Bed 56.1 Counterstatement ¶ 46. The benchwalls, which run along the sides of the tunnels from "portal to portal," are structures within the tunnels that "house ducts that contain electrical wiring, equipment, cables, and other essential equipment," as well as serve as a means of egress from, and access to, trains during emergencies. *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts In Support Of Insurers' Motion For Partial Summary Judgment Regarding Replacement of Benchwalls and Track Bed ("Insurers' Benchwalls/Track Bed 56.1 Statement"), ECF Dkt. No. 176, ¶ 14. The replacement benchwalls would be the same height as the train floors. *See* Amtrak's Benchwalls/Track Bed 56.1 Counterstatement ¶ 45. The repairs to both the track bed and benchwalls, Amtrak asserts, implement standard number 130 ("NFPA 130") of the National Fire Protection Association ("NFPA"), a non-profit organization that compiles, but has no power to enforce, safety standards for use and adoption by local governments. *See* Insurers' Benchwalls/Track Bed 56.1 Statement ¶¶ 35–36.

Against the background of the foregoing facts and allegations, the Court turns to the parties' motions. The motions for summary judgment present the following four issues: first, whether the $125 million sublimit for losses resulting from the peril of "flood" applies to the damage Amtrak incurred from the storm surge that caused the inundation of Amtrak's property; second, whether the damage from the chloride attack constitutes "ensuing loss" to which the flood sublimit does not apply; third, whether Amtrak's losses arose from a single or multiple occurrences; and fourth, whether the policies obligate the Insurers to provide coverage for repairs to undamaged portions of the track bed and benchwalls.

The applicability of the $125 million sublimit turns on whether the definitions of "flood" in the policies here at issue encompass inundation caused by storm surge. "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). Ambiguity exists where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps. Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

■ The Court finds that both definitions of the term "flood" unambiguously encompass inundation of normally dry land that is caused by storm surge. Storm surge, as the parties agree, *see supra* footnote 4, pushes water beyond its usual borders and onto normally dry land. This fits easily within the Majority Definition, which defines flood as "a rising and overflowing of a body of water onto normally dry land," and the Minority Definition,

which defines flood, in part, as "a temporary condition of partial or complete inundation of normally dry land from ... the overflow of inland or tidal waters outside the normal watercourse or natural boundaries." *Cf., e.g., Corban v. United Servs. Auto. Ass'n,* 20 So.3d 601, 611 (Miss.2009) ("'[S]torm surge' is plainly encompassed within the 'flood' or *'overflow of a body of water'* portions of the 'water damage' definition, and no other 'logical interpretation' exists.") (quoting *United States Fid. & Guar. Co. of Mississippi v. Martin,* 998 So.2d 956, 963 (Miss.2008)) (emphasis added).

Indeed, Amtrak concedes that the "colloquial" use of the word "flood" encompasses the type of inundation that Amtrak's tunnels sustained during Superstorm Sandy. *See* Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgment Regarding the Flood Sublimit ("Amtrak 1/15/2015 Reply Br."), ECF Dkt. No. 141, at 3. Likewise, Amtrak acknowledges that the definitions of flood at issue mirror how dictionaries define "flood." *See id.* To take just one example, Merriam–Webster defines flood as "a rising and overflowing of a body of water esp. onto normally dry land." Merriam–Webster's Collegiate Dictionary 480 (11th ed.2003). *See also, e.g.,* American Heritage Dictionary of the English Language 674 (4th ed.2000) ("[a]n overflowing of water onto land that is normally dry"). In the face of the general rule that, "[w]hen construing an insurance contract, the tests to be applied are common speech

and the reasonable expectation and purpose of the ordinary businessman," *Wai Kun Lee v. Otsego Mut. Fire Ins. Co.,* 49 A.D.3d 863, 854 N.Y.S.2d 211, 212 (2d Dep't 2008) (internal quotation marks omitted), one would think that this would end the matter.

Nevertheless, Amtrak contends that the definitions of flood in the policies here exclude storm surge-caused inundation. According to Amtrak, "loss by the peril of flood" is a "different phenomenon" from inundation caused by storm surge or wind-driven water, and the former "occurs when the volume of water in a given watercourse is too great to be contained within that body of water, such as when heavy rainfall or snow melt causes a river to rise and overflow onto normally dry land."[5] Plaintiff's Memorandum of Law In Opposition To Defendant–Insurers' Motion for Summary Judgment—Application of Flood and Occurrence Provisions ("Amtrak 3/30/2015 Br."), ECF Dkt. No. 189, at 11–12; *see also* Amtrak 3/30/2015 56.1 Counterstatement ¶ 27; Transcript of April 27, 2015 Hearing ("4/27/15 Tr."), ECF Dkt. No. 235, at 23:13–15 ("Storm surge happens from a hurricane, from a windstorm. Floods happen when there is an enormous amount of rainfall."). As support for this distinction, Amtrak engages in a comparison of the definitions of flood employed here to the definitions used in other policies. As Amtrak observes, the case law is replete with examples of policies explicitly defining flood to include "storm surge" or "wind-

---

5. In support of its motion for summary judgment on this issue, Amtrak asserted that the "recognizable meaning to 'a rising and overflowing of a body of water onto normally dry land' ... [is that it] identifies the particular circumstance when a body of water rises up and overflows its banks or boundaries onto the surrounding dry land," which Amtrak claimed "is different from when a wind-driven storm surge drives water inland, far be-

yond any banks or boundaries." Amtrak 12/18/2014 Br. at 13. What Amtrak describes as the "recognizable meaning" of the Majority Definition is simply a near-verbatim restatement of its text. As for Amtrak's contention that inundation caused by wind-driven storm surge is not flood because water ends up especially far from the banks, the Court sees no support for such a construction in the text of the policies or elsewhere.

driven water," *see, e.g., New Sea Crest Health Care Ctr., LLC v. Lexington Ins. Co.*, No. 12 Civ. 6414, 2014 WL 2879839, at *2 (E.D.N.Y. June 24, 2014), and indeed, one of the insurers in this case, Westport Insurance Co., issued a policy (which Amtrak concedes covers the inundation it sustained as a result of Superstorm Sandy) that defines flood to mean, "surface water, flood waters, waves, tide or tidal waters, *sea surge,* tsunami, the release of water, the rising, overflowing or breaking of defenses of natural or manmade bodies of water or *wind driven water,* regardless of any other cause or [e]vent contributing concurrently or in any other sequence of loss." Insurers' 3/9/2015 56.1 Statement ¶ 9 (emphasis added). Amtrak contends that the failure of the remaining defendant-insurers to include similar language evidences that the definition of "flood" in their policies excludes inundation caused by storm surge. Amtrak further argues that the case law that addresses similar definitions of "flood" supports this conclusion. *See Seacor Holdings, Inc. v. Commonwealth Ins. Co.*, 635 F.3d 675 (5th Cir.2011); *Public Service Enterprise Group, Inc. v. ACE American Ins. Co.*, No. ESX–L–4951–13, 2015 N.J.Super. Unpub. LEXIS 620 (N.J.Super. Mar. 23, 2015); *Pinnacle Entertainment, Inc. v. Allianz Global Risks U.S. Insurance Co.*, No. 06 Civ. 00935, 2008 WL 6874270 (D.Nev. Mar. 26, 2008).

Amtrak's argument falters at each step. *First and foremost*, the interpretation of "flood" that Amtrak advances cannot be reconciled with the plain language of the policies. Even if the Majority Definition or Minority Definition could be read to contain a volume-based restriction when viewed in isolation, a contract must be construed as a whole, *see, e.g., CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 59 A.D.3d 486, 874 N.Y.S.2d 174, 176 (2d Dep't 2009), and Amtrak's pro-

posed narrow interpretation is at odds with the "single loss" provision in the policies. That provision, in relevant part, states that "loss by ... flood" "result[ing] from any tidal wave or series of tidal waves caused by any one disturbance" will be treated as a "single loss." Insurers' 3/9/2015 56.1 Statement ¶ 6. Multiple courts have found that storm surge "is little more than a synonym for a *'tidal wave'* or wind-driven flood." *New Sea Crest,* 2014 WL 2879839, at *3 (quoting *Bilbe v. Belsom,* 530 F.3d 314, 317 (5th Cir.2008)) (emphasis added). Arguably, this, on its own, proves that the policies contemplate that inundation caused by storm surge constitutes "flood." Amtrak argues that the single loss provision's treatment of tidal waves caused by a "disturbance" refers to tidal waves caused by earthquakes, *see* Amtrak 1/15/2015 Reply Br. at 4, but there is no reason in the text of the policies to limit the scope of the single loss provision in this manner. In fact, the single loss provision itself separately refers to "earthquakes," and the use of the distinct term "disturbance," in the Court's view, communicates an intent to encompass more than just earthquake-caused "tidal waves." *See also, e.g.,* Merriam–Webster's Collegiate Dictionary 1233 (10th ed.1997) (defining "tidal wave" as both "an unusually high sea wave that sometimes follows an earthquake" and "an unusual rise of water alongshore due to strong winds").

Moreover, even if tidal wave did not encompass storm surge, the language of the "single loss" provision, as stated above, unambiguously contemplates that "flood," for purposes of these policies, encompasses floods caused by tidal waves, not merely, as Amtrak claims, floods caused by an increase in the *volume* of a given body of water from something such as snow melt or rain. The Court recognizes that the

"single loss" provision does not define the term "flood"; but if the Court interprets the Majority and Minority Definitions of flood to exclude floods caused by tidal waves, as Amtrak's volume-based argument requires, then at least a portion of the single loss provision will be rendered superfluous. Such a result would contravene basic principles of contract interpretation. *See, e.g., Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Trust Co. of New York,* 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 727 N.E.2d 563 (2000). Accordingly, the Court declines to adopt Amtrak's volume-based interpretation.

■ *Second,* Amtrak's consultation of other policies to prove the meaning of the policies in issue is inappropriate. Under New York law, extrinsic evidence should not be consulted unless an ambiguity exists. *See, e.g., W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). The Insurers are not "charged with reading *all* the policies issued" that define flood coverage, "but only the terms of their *own* policies." *Cf. Kenavan v. Empire Blue Cross & Blue Shield,* 248 A.D.2d 42, 677 N.Y.S.2d 560, 563 (1st Dep't 1998). Differences among policies, therefore, cannot be used to show a "meeting of the minds" of the parties to the policy under consideration. *See id.* As just explained, both the Majority Definition and Minority Definition are, on their own, broad enough to encompass inundation caused by storm surge, and the single loss provision confirms the lack of any ambiguity. There was therefore no need for the Insurers to include additional terms to achieve what their policies accomplished with more brevity, and the Court views "the failure to include the phrase 'whether driven by wind or not' [or storm surge] as more indicative of a lack of specificity ... than an omission evidencing [an] intent to nar-

row" the definition of flood. *See Northrop Grumman Corp. v. Factory Mut. Ins. Co.,* 563 F.3d 777, 786 (9th Cir.2009).

*Third,* the case law on which Amtrak relies is inapposite. *Public Service Enterprise Group, Inc. v. ACE American Ins. Co.* addressed a policy that explicitly included "storm surge" within the definition of named windstorm. *See* 2015 N.J.Super. Unpub. LEXIS 620, at *11. Similarly, in *Pinnacle Entertainment, Inc. v. Allianz Global Risks U.S. Insurance Co.,* the policy at issue "provide[d] specific coverage for Weather Catastrophe Occurrences," a term defined to include "all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, *including, but not limited to flood.*" 2008 WL 6874270, at *5 (emphasis added). The court found that this definition, which was distinct from a separate definition for flood, "indicate[d] that flood damage associated with a named storm or weather disturbance is covered as a separate and distinct event from Flood as defined in the policy." *Id.* Here, in contrast, there is no other provision that "indicates" that floods associated with storms are to be treated differently than other floods. Although Amtrak suggests that storm surge could be shoehorned into the peril of "windstorm" or "Named Storm," which do appear in the policies, these terms (only the latter of which is defined) contain no reference to "flood" or to "storm surge." *Public Service Enterprise Group* and *Pinnacle Entertainment* are, as a result, of little utility in discerning the scope of the definitions of flood here.

The third case to which Amtrak points the Court, *Seacor Holdings, Inc. v. Commonwealth Ins. Co.,* requires a more extended discussion, but is equally unpersuasive. Although Amtrak did not cite *Seacor* in its briefing on this issue, at oral argument counsel for Amtrak took the position

that the *Seacor* court held that "storm surge" should be "put ... into the [windstorm] category." *See* 4/27/2015 Tr. at 49:13–25; *Seacor*, 635 F.3d at 679. A proper understanding of *Seacor*, however, demonstrates that it does not support Amtrak's cause. The *Seacor* court was first tasked with deciding whether to apply a deductible for flood in addition to a deductible for Named Windstorm, a decision that turned, in part, on whether the insured's losses were "caused directly by" Hurricane Katrina's winds. *See* 635 F.3d at 681–82. After consulting Louisiana law on "proximate or efficient cause," the court determined that "[Hurricane] Katrina's winds were the proximate cause of [the insured's] water-related damages" and held that only the Named Windstorm deductible applied. *Id.* at 682. The Fifth Circuit then took up the defendant-insurer's alternative argument that a flood sublimit applied. *Id.* at 683. Applying the same reasoning, the court concluded that the sublimit did not apply because the loss was not "caused by" the peril of flood: it was caused by Hurricane Katrina's winds. *See id.*

In other words, *Seacor* is about causation, not about the scope of the term "flood." In fact, the policy under consideration in *Seacor* defined flood to include "inundation ... whether wind-driven or not." *See id.* at 679. This is the precise type of language that Amtrak suggests that the Insurers should have added if they wanted the sublimit to apply to Amtrak's Sandy losses. And, indeed, the Fifth Circuit commented that the sublimit for flood would apply to inundation caused by wind-driven water so long as the wind was not part of " 'another covered peril, such as a Named Storm.' " *Id.* at 683 (quoting *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 960–

61 (5th Cir.2009)). *Seacor* therefore does not help Amtrak's argument that storm surge-caused inundation falls outside of the definition of flood.

To the extent Amtrak raised *Seacor* to argue that the damages it sustained because of Superstorm Sandy were actually caused by the peril of named storm or windstorm, the argument, if not waived,[6] is meritless. Although "there are times when the law permits [courts] to go far back in tracing events to causes," the inquiry here "is how far the parties to this contract intended us to go." *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86 (1918) (emphasis omitted). Again, the "single loss" provision guides the Court; by explaining that loss from tidal wave-induced flood "caused by any one disturbance" counts as "loss by ... flood," the "single loss" provision instructs that the cause, for purposes of these policies, is the flood, not the "disturbance" (or, for that matter, the tidal wave). It follows that Amtrak's losses here were caused by flood.

Thus, the Court concludes that both the Majority Definition and the Minority Definition of flood encompass inundation caused by storm surge and that, because Amtrak's damages arose from such inundation, the flood sublimit applies.

■ This brings the Court to Amtrak's argument that, even if the sublimit applies to some of Amtrak's losses arising from Superstorm Sandy, loss resulting from the chloride attack constitutes "ensuing loss" that is beyond the reach of the flood sublimit. "Ensuing loss" is a term of art in insurance law, and policies allowing for recovery of such loss " 'provided coverage when, as a result of an excluded peril, a covered peril arises and causes damage.' "

---

**6.** In its brief in opposition to the Insurers' motion, Amtrak argued that storm surge is a separate peril and was the cause of Amtrak's losses. *See* Amtrak 3/30/2015 Br. at 15.

*Platek v. Town of Hamburg*, 24 N.Y.3d 688, 695, 3 N.Y.S.3d 312, 26 N.E.3d 1167 (2015) (quoting 2 Ostrager & Newman, Insurance Coverage Disputes § 21.04[h] at 1721 (17th ed.2015)). Put differently, ensuing loss occurs when an insured sustains "a new loss to property that is of a kind not excluded [or subjected to a sublimit]," *id.* at 696, 3 N.Y.S.3d 312, 26 N.E.3d 1167 (internal quotation marks omitted), and that is "collateral or subsequent" to the excluded or sublimited loss, *see Narob Dev. Corp. v. Ins. Co. of N. Am.*, 219 A.D.2d 454, 631 N.Y.S.2d 155, 156 (1st Dep't 1995). When applying ensuing loss provisions, moreover, "courts have sought to assure that the exception [for ensuing loss] does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk." *Narob Dev. Corp.*, 631 N.Y.S.2d at 155–56.

Amtrak's theory is as follows. Amtrak first suffered "water damage" when the water from the East and Hudson Rivers inundated its tunnels and caused damage to various Amtrak-owned equipment. Thereafter, Amtrak pumped water out of the tunnels, but chlorides from the brackish water were left behind. The chlorides then combined with a certain level of humidity, with oxygen, and with the existing steel structures in the tunnel, to trigger a "chloride attack" that caused (and contin-

ues to threaten) damage to the steel structures.[7] According to Amtrak, the "chloride damage" was "collateral to" the "water damage" because it was caused by the interaction of chloride, humidity, and steel—not water and steel—and it was "subsequent" because the chloride attack could not begin until the water was pumped out.[8]

◼ The distinction that Amtrak draws between "water damage" and "chloride damage" is artificial, especially in the context of a sublimit that applies to "flood." For loss to constitute "ensuing loss" from flood, the flood must cause some sort of damage that, in turn, creates a separate damage-causing agent that brings about "ensuing loss." *Cf. Platek*, 24 N.Y.3d at 695, 3 N.Y.S.3d 312, 26 N.E.3d 1167 (explaining that the classic example of "ensuing loss" is loss resulting from a fire caused by damage from an earthquake). Here, the damage from the flood did not give rise to a different type of peril; rather, one aspect of the flood of brackish seawater—the inundation of salt—was left behind and it caused damage. This may have been subsequent to the moment of the influx of water, but it was not subsequent to loss caused by the peril of flood: it was a part of those losses. A reasonable insured would expect that, if flood waters are left to sit on covered property, the

---

7. The Insurers, for purposes of summary judgment, do not contest the facts underlying Amtrak's ensuing loss theory. Nevertheless, the Court notes that Amtrak has not presented a consistent theory of how this "chloride attack" works. In its counterstatement of facts, Amtrak asserts that the chloride attack "requires a combination of chlorides, humidity and oxygen." Amtrak 3/30/2015 56.1 Counterstatement ¶ 56. Amtrak then cites the deposition testimony of two of its experts as authority for this proposition. One of those experts, however, testified that "*electrochemical* corrosion" occurs "the moment" when a track is "*power[ed]*" if that track is "wet."

Gilinsky Decl., Ex. R, Deposition of Francisco Robles Hernandez, at 225:24–226:14 (emphasis added).

8. Amtrak also asserts that, because this ensuing loss provision appears in the context of a sublimit rather than an exclusion, the normal reluctance to interpreting an "ensuing loss" provision to recapture coverage for an excluded risk should not apply. The Court sees no merit in this argument. A reading of an "ensuing loss" provision that would render a sublimit meaningless is just as dubious as one that would render an exclusion meaningless.

damage that results is damage from flood, not "ensuing loss." That result does not change simply because Amtrak engaged in a partial cleanup of the flood. *Cf. Dillard Univ. v. Lexington Ins. Co.*, No. 06 Civ. 4138, 2009 WL 1565943, at *2 (E.D.La. June 3, 2009) ("manifestation or worsening of the flood damage" is not "ensuing loss").

Stripped of the labels designed to facilitate Amtrak's ensuing loss argument, the "chloride attack" that Amtrak posits is corrosion. *See* Amtrak 3/30/2015 Br. at 19 ("[R]ust and corrosion from chlorides following a storm surge is ensuing loss here."). When brackish water floods areas containing steel, corrosion "is a natural and expected" result. *See Prudential Prop. & Cas. Ins. Co. v. Lillard–Roberts*, No. 01 Civ. 1362, 2002 WL 31495830, at *20 (D.Or. June 18, 2002) (mold from water leak is not ensuing loss from excluded peril of faulty workmanship); *see also TMW Enterprises, Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 575, 579 (6th Cir.2010) ("weakening [of] structural integrity" of building resulting from water damage is not ensuing loss to excluded faulty workmanship "because defective wall construction naturally and foreseeably leads to water infiltration"). The damage from the "chloride attack" is therefore properly viewed as "directly related to the original excluded risk," *Narob Dev. Corp.*, 219 A.D.2d 454, 631 N.Y.S.2d at 155–56, rather than as "ensuing loss" that is the consequence of a "separate and independent" peril. *See Prudential Prop.*, 2002 WL 31495830, at *20. As a result, Amtrak cannot take shelter in the ensuing loss provision,[9] and the flood sublimit operates against all of Amtrak's damages.[10]

9. Amtrak also suggests that the flood is not the efficient proximate cause of the chloride damage. To the contrary, as just explained, even if Amtrak is correct that the "water damage" is not the efficient proximate cause of the chloride damage, the peril of flood is.

10. The Insurers, in their memorandum of law in support of their motion for summary judgment, made clear that, if the Court were to determine that the storm surge-caused inundation constituted "flood" and that the chloride damage is not "ensuing loss"—which the Court now has—then dismissal of the excess insurers was warranted. *See* Defendant–Insurers' Memorandum of Law in Support of Their Motion for Summary Judgment–Application of Flood and Occurrence Provisions, ECF Dkt. No. 179, at 2. This is because (1) the excess insurers are not required to provide coverage until, at a minimum, the $125 million primary layer is satisfied, (2) rulings that the flood sublimit applied and that there was no ensuing loss cap Amtrak's damages at $125 million for the "water damage" and "chloride damage," and (3) the Insurers took the position that Amtrak suffered no other damage. Amtrak did not contest this point in its opposition brief, and the Court, when it issued its bottomline Order granting the Insurers' motion, therefore dismissed the excess insurers. *See* June 24, 2015 Order. Following the issuance of that Order and notwithstanding its previous silence, Amtrak moved for reconsideration on the ground that it suffered non-flood—specifically, losses attributable solely to wind—that were not subject to the sublimit and that would have to be covered by the excess insurers if Amtrak recovered $125 million on the primary layer. The Court denied the motion. *See* July 1, 2015 Order, ECF Dkt. No. 331. What Amtrak attempted to frame as mere "mistake, inadvertence, surprise, or excusable neglect," *see* Fed.R.Civ.P. 60(b)(1), was anything but. Two Amtrak 30(b)(6) witnesses testified that Amtrak's losses were confined to losses from the inundation and the alleged chloride attack. *See* Rawlings Dep. at 206:22–207:12; Lestelle Decl., Ex. B, Deposition of Randolph H. Goodman, at 182:07–183:04. Likewise, Amtrak failed to meaningfully dispute the Insurers' contention in their Rule 56.1 statement that Amtrak suffered no non-water, non-chloride damage. *See* Amtrak 3/30/2015 56.1 Counterstatement ¶¶ 43, 46. In any event, Amtrak simply provided no valid excuse for its failure to identify these non-flood losses the first time around; instead, it conceded that, "with hindsight," it "should have." Memorandum of Law in Support of Motion for Reconsideration of Order Granting Motion for Summary Judgment–Application of Flood

Having concluded that the flood sublimit applies and that Amtrak's "chloride damage" does not qualify as "ensuing loss," the Court now turns to Amtrak's argument that its losses arose from multiple occurrences. Specifically, Amtrak asserts that its losses arose from three different occurrences. "Occurrence number one is the water damage directly caused by the peril of storm surge." Amtrak 3/30/2015 Br. at 24–25. "Occurrences number two and three" are the chloride damage that Amtrak suffered at the NRT and the chloride damage that Amtrak suffered at the ERT. Amtrak separates the damages it incurred in the two tunnels from the first occurrence because those damages, in Amtrak's view, arose indirectly from the storm surge, and it separates the second and third occurrences from one another because "the NRT and the ERT each suffered chloride damage miles and days apart." *Id.* at 24–25. *But cf.* Sullivan Decl. ¶ 11 (stating that the water was pumped out of the North Tube of the NRT and the tubes in the ERT on the same day).

■ "[T]he meaning of 'occurrence' must be interpreted in the context of the specific policy and facts of th[e] case." *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 136 n. 9 (2d Cir.1986). Here, review of the specific—and lengthy—definition of "occurrence" incorporated into each policy, leads to the conclusion that all the losses here unambiguously arose from a single occurrence. Amtrak's various insurance policies define an "occurrence" as

Any insured loss or several insured losses arising directly from one common cause, event or catastrophe and during the period of this insurance. If such loss or several losses are attributable to several causes in an unbroken chain of causation, the cause which triggered the chain of causation is understood to be the common cause, event or catastrophe. All such loss or losses shall be added up and the result shall be treated as one occurrence irrespective of the period of time or area within which such losses occur.

Insurers' 3/9/2015 56.1 Statement ¶ 21. If, as the Insurers argue, the chloride damage "ar[ose] directly from" the flooding, then all of Amtrak's losses arose from a single occurrence pursuant to the first sentence of the "occurrence" definition. If, as Amtrak argues, the storm surge did not cause the chloride damage directly, it nonetheless caused the circumstances that brought about such damage. Thus, even assuming, *arguendo,* that Amtrak is correct in this aspect of its causation analysis, all losses are still part of a group of "losses ... attributable to several causes in an unbroken chain of causation" that traces back to the same "trigger." [11] Under the second sentence of the definition of "occurrence," then, these losses must still be grouped together as a single occurrence.

Amtrak's attempt to avoid this result is, once again, in tension with the policy language. Amtrak argues that the reference to "such losses" in the second sentence of the "occurrence" definition refers back not just to "[a]ny insured loss or several insured losses" in the first sentence, but to the entire phrase "[a]ny insured loss or several insured losses arising directly from one common cause." *See Amtrak*

___

and Occurrence Provisions, ECF Dkt. No. 259, at 3. This may win Amtrak points for candor, but it does not establish that Amtrak's oversight was "excusable" or that relief is justified for any other reason. *See* Fed. R.Civ.P. 60(b)(1), (6).

11. Amtrak's decision to pump the water out of the tunnels may have accelerated this chain of causation, but it did not break it.

3/30/2015 Br. at 22. Thus, Amtrak reasons, for the "unbroken chain of causation" clause to apply, all loses stemming from an unbroken chain of causation must arise directly from the first link in the chain. *Id.* at 22–23. Because, in Amtrak's view, the chloride damages arose indirectly from the flood, the second sentence does not apply, and the chloride damages are part of a separate occurrence from the water damage. Moreover, drawing on the Second Circuit's decision in *Newmont Mines,* which affirmed a jury's finding that the collapse of two separate sections of a roof (of a "huge" complex of "approximately 500 feet" in length) under the weight of snow "at least three, and perhaps as many as seventeen, days apart" constituted two occurrences, 784 F.2d at 129, 137, Amtrak concludes that the chloride damage in the NRT and ERT constitutes two separate occurrences.

To read the definition of occurrence in the manner Amtrak requests is to read it out of the policy. If the losses arise directly from the first link in the chain of causation, then the first sentence in the definition already applies, and there is no need for the second sentence. Hence, the second sentence, if it is not to be a mere redundancy, cannot be read to apply only when all losses already arise directly from one common cause; instead, it must be read to apply to losses that arise directly from different links in the same, unbroken chain of causation, but indirectly from the first link. While Amtrak complains that this construction is contrary to the "approach to causation" that New York courts apply, *see* Amtrak 3/30/2015 Br. at 23 n. 101, the Court disagrees. The manner in which the law of causation may apply to the interpretation of "occurrence" when

the term is undefined is of little moment when, as here, the parties expressly agreed to a specific meaning. For the same reason, Amtrak's reliance on *Newmont Mines,* which dealt with a policy that did not define "occurrence," is misplaced. Accordingly, the Court rejects Amtrak's argument that its damages arose from multiple occurrences and concludes that all of Amtrak's damages from Superstorm Sandy are the product of a single occurrence.

■ The remaining summary judgment issue concerns Amtrak's right to coverage for the cost of repairing undamaged portions of the track bed and benchwalls. Each of Amtrak's insurance policies includes a "demolition and increased cost of construction" clause (the "DICC Clause") that provides a limited right to coverage for undamaged property.[12] The DICC Clause provides:

> In the event of loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of property, this Company shall be liable for:
>
> (1) the cost of demolishing the undamaged property including the cost of clearing the site;
>
> (2) the proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;
>
> (3) increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site, limited to the cost that would have been incurred in order to comply with

---

**12.** Amtrak argues that, even if the DICC Clause does not apply, it can recover under a separate provision that requires the Insurers to cover the "replacement cost new" of damaged property. The Insurers' motion did not request a ruling on the applicability of that provision, and so the Court declines to address it.

the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site. However, this Company shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;

(4) any increase in the Time Element loss arising out of the additional time required to comply with said law or ordinance.

*See, e.g.,* Federal Insurance Co. Policy ¶ 8.A. The Insurers contend that portions of the track bed and benchwalls did not suffer any damage and that Amtrak has failed to offer any evidence showing that the alleged losses it did suffer "cause[d] the enforcement of any law, ordinance, governmental directive or standard" that require repairs to those undamaged portions and thereby trigger coverage. Amtrak, which bears the burden of proving coverage, *see Morgan Stanley Grp. Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir.2000), argues that it must replace the entirety of the track bed and benchwalls to comply with certain local fire ordinances, with the directives of the Federal Railroad Administration (the "FRA"), and with the American with Disabilities Act (the "ADA"). The Court agrees with the Insurers.

To begin with, Amtrak, under the circumstances presented here, need not comply with local fire ordinances. As the Insurers observe, 49 U.S.C. § 24902(j) provides that, "in connection with the construction, ownership, use, [or] operation ... of ... any land ... on which [an improvement that is part of the Northeast Corridor Improvement Project] is located," Amtrak shall be exempt from any "State or local law from which a project would be exempt if undertaken by the Federal Government or an agency thereof

within a Federal enclave wherein Federal jurisdiction is exclusive." "Section 24902(j) was intended to exempt Amtrak from burdens imposed by state and local governments." *City of New York v. Nat'l R.R. Passenger Corp.,* 06 Civ. 793, 2009 WL 483343, at *4 (E.D.N.Y. Feb. 25, 2009); *see also Nat'l R.R. Passenger Corp. v. Caln Twp.,* 08 Civ. 5398, 2010 WL 92518, at *4 (E.D.Pa. Jan. 8, 2010). Amtrak failed to even address § 24902(j) in its briefing and at oral argument argued only that the provision applies to "zoning and building laws," not fire codes. *See* 4/27/15 Tr. at 64:17–22. But while the provision begins with a reference to "local building, zoning, subdivision, or similar or related law"—which itself arguably encompasses fire codes—it then clarifies that its reach extends to "*any other* State or local law" from which the federal government would be exempt when undertaking a project on federal property. 49 U.S.C. § 24902(j) (emphasis added). As Amtrak has previously recognized, the statute has a broad reach, *see Nat'l R.R. Passenger Corp. v. McDonald,* Brief of Plaintiff–Appellant Nat'l R.R. Passenger Corp., 2014 WL 495081 (C.A.2), at *23–24 (asserting that § 24902(j) "immunizes Amtrak's property and the use of that property from state and local laws as if it was part of a 'Federal enclave wherein Federal jurisdiction is exclusive' "), and the Court finds that it applies here.

Further, Amtrak has failed to raise a genuine issue of fact regarding whether the FRA will require that Amtrak make the proposed portal-to-portal repairs to the track bed and benchwalls. The Court accepts for these purposes Amtrak's premise that the FRA has authority to regulate Amtrak, *see* Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment Regarding Replacement of Benchwalls and Track Bed. ECF Dkt. No. 188, at 16. If, therefore, the

FRA had issued a directive compelling Amtrak to comply with NFPA 130 or to undertake any specific improvements, the analysis would be different. But no such directive has issued. And neither Amtrak's observation that the FRA has, in the past, referred to NFPA 130, see *id.*, nor its speculation that the FRA may require compliance at some unknown time in the future, *cf., e.g.,* Sullivan Decl. ¶ 13 (vaguely predicting that Amtrak "expects that it will have to comply with" NFPA 130), is sufficient to create a genuine issue of fact regarding whether Amtrak's losses "cause[d] the enforcement of any law, ordinance, governmental directive or standard." *See, e.g.,* Federal Insurance Co. Policy ¶ 8.A.

Further still, Amtrak also has not shown that the ADA mandates that it make the repairs to the undamaged portions of the track bed or benchwalls. Amtrak argues that replacement of the current track bed with a direct fixation system, which will create a level walking surface, and replacement of the benchwalls, which will allow for the construction of new benchwalls at the same height as the train floors, will increase accessibility for physically disabled persons. *See* Amtrak's Benchwalls/Track Bed 56.1 Counterstatement ¶¶ 45–46. But while this goal is laudable, Amtrak has not shown it to be mandated by law. The relevant regulation provides,

When a public entity alters an existing facility or a part of an existing facility used in providing designated public transportation services in a way that affects or could affect the usability of the facility or part of the facility, the entity shall make the alterations (or ensure that the alterations are made) in such a manner, to the maximum extent feasible, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.

49 C.F.R. § 37.43(a)(1). The plain language of this provision allows alterations only to "part of an existing facility." [13] Thus, if Amtrak repairs the parts of the track bed and benchwalls that have been damaged, nothing in § 37.43 would seem to require repairs to the remainder of those structures. Although Amtrak cites to § 37.43, it fails to address this obvious hole in its argument.[14] Nor has Amtrak identified any other portion of the ADA that would require repairs to the undamaged portions of these structures.

Accordingly, the Court concludes that the repairs that Amtrak desires to make to the undamaged portions of the track bed and the benchwalls are not required by local ordinances, the FRA, or the ADA, and Amtrak is therefore not entitled to coverage for such repairs under the DICC Clause.[15]

---

13. "Facility" is defined as "all or any portion of buildings, structures, sites, complexes, equipment, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 49 C.F.R. § 37.3.

14. Nor has Amtrak explained why the ADA requires replacement of the portion of the track bed under the tunnels but not replacement of the track bed that extends outside of the tunnels.

15. The Insurers also request that the Court rule that Amtrak is not entitled to coverage for the portions of the track bed and benchwalls that were, according to the Insurers, not inundated. Construing the record in the light most favorable to Amtrak, the Court declines to make such a finding, as it requires that the Court equate a lack of inundation with a lack of damage, even though the brackish water (the alleged cause of the chloride damage) was pumped through portions of the tunnels that were not inundated.

The Court now takes up the Insurers' motion to dismiss Amtrak's demand for consequential damages. Amtrak's demand for consequential damages encompasses (1) attorneys' fees and costs, (2) damages related to Amtrak's loss of peace of mind, and (3) losses resulting from "the diversion of Amtrak from its restoration efforts." [16] Amended Complaint, ECF Dkt. No. 65, ¶ 122. The Court denied the Insurers' motion with respect to the first category of alleged consequential damages and granted the Insurers' motion with respect to the latter two categories.

◼ It is well established that, in general, "an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 324, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). Amtrak argues, however, that the New York Court of Appeals carved out a generally applicable exception to this rule when it stated, in a 2008 decision, that "consequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as the damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'" *Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203, 856 N.Y.S.2d 513, 886 N.E.2d 135 (2008) (quoting the companion case *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192, 856 N.Y.S.2d 505, 886 N.E.2d 127 (2008)).

While the Court recognizes that, consistent with Amtrak's interpretation, neither *Panasia Estates* nor its companion case, *Bi-Economy Market*, on its face limits the type of consequential damages available, New York courts have since rejected the argument that Amtrak makes here. *See, e.g., Stein, LLC v. Lawyers Title Ins. Corp.*, 100 A.D.3d 622, 953 N.Y.S.2d 303, 304 (2d Dep't 2012); *Authelet v. Nationwide Mut. Ins. Co.*, No. 03–15522, 2008 N.Y. Misc. LEXIS 7527, at *9 (Sup.Ct. Oct. 24, 2008).

◼ Nevertheless, the Court allowed Amtrak's claim for attorneys' fees to go forward, albeit in a more limited manner. The New York Court of Appeals has suggested that an exception to the general rule prohibiting claims for attorneys' fees may exist when the insured can make "a showing of such bad faith [on the part of the insurer] in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." *Sukup v. State*, 19 N.Y.2d 519, 522, 281 N.Y.S.2d 28, 227 N.E.2d 842 (1967); *see also, e.g., Liberty Surplus Ins. Corp. v. Segal Co.*, No. 03 Civ. 2194, 2004 WL 2102090, at *4 (S.D.N.Y. Sept. 21, 2004). Here, Amtrak has alleged that the Insurers declined to make interim payments required under the policies for amounts that are "not the subject of a reasonable dispute" and that the Insurers conditioned additional payments of undisputed amounts on certain legal concessions. Amended Complaint ¶¶ 65, 94, 117. These allegations are sufficient at the pleadings stage.

---

**16.** Amtrak also initially sought to recover for "unnecessary expenses imposed on Amtrak through the unduly protracted adjustment process.'" *See* Amtrak's Memorandum of Law in Opposition to Defendant-Insurers' Partial Motion to Dismiss, ECF Dkt. No. 106, at 7. The Court ordered Amtrak to file a more definite statement explaining how these expenses differed from "loss adjustment expenses" that Amtrak alleged it was entitled to under the express terms of its policies. *See* Amended Complaint ¶ 62; February 13, 2015 Order. In its more definite statement, Amtrak expressed that it had yet to "identif[y] other categories of unnecessary expenses." *See* More Definite Statement, ECF Dkt. No. 166, ¶ 1.

The remainder of Amtrak's consequential damages demands, however, must be dismissed. First, Amtrak cannot recover for any loss of peace of mind for the simple reason that a corporation, unlike an individual, "cannot suffer personal humiliation or mental anguish." *Wolf St. Supermarkets, Inc. v. McPartland,* 108 A.D.2d 25, 487 N.Y.S.2d 442, 448 (4th Dep't 1985). Second, Amtrak's demand for consequential damages arising from Amtrak being "divert[ed] ... from its restoration efforts," Amended Complaint ¶ 122, is too vague and conclusory to withstand the Insurers' motion. Not only has Amtrak failed to allege facts showing that these damages were brought within the contemplation of the parties at the time of contracting, but it has also failed to explain what these damages constitute. Consequential damages are special damages that must be "specifically stated." Fed. R.Civ.P. 9(g). "The primary purpose of Rule 9(g) is one of notice, both to inform defending parties as to the nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.,* 745 F.3d 703, 725 (4th Cir.2014) (internal quotation marks omitted). Amtrak's allegations fall short of satisfying this standard.

Accordingly, for the foregoing reasons, the Court issued its bottom-line Orders denying Amtrak's motions for summary judgment; granting in part and denying in part the Insurers' motions for summary judgment; and granting in part and denying in part the Insurers' motion to dismiss.