920 A.2d 73

GINGER PACIFICO, PLAINTIFF–RESPONDENT, v. JAMES
PAUL PACIFICO, DEFENDANT–APPELLANT.

Argued February 13, 2007—Decided April 18, 2007.

*John E. Lanza,* argued the cause for appellant (*Lanza & Lanza,* attorneys; *Kenneth W. Thomas,* on the brief).

*George G. Gussis,* argued the cause for respondent.

Justice LONG delivered the opinion of the Court.

Plaintiff, Ginger Pacifico (now Gaspari) and defendant, James Pacifico, were married in 1978 and divorced in 1997. At the time of their divorce, the parties' two sons, Anthony and Jason, lived with Ginger in the marital home. Pursuant to a property settlement agreement (PSA) dated December 2, 1996, that was incorporated into the final judgment of divorce, James was to pay Ginger child support of $435 a week and permanent alimony of $100 a week. Ginger, who was unemployed, was to remain in the marital home with the boys and was responsible for the mortgage, proper-

ty taxes, and homeowners' insurance, to be paid out of the support provided by James. The PSA further stated that the parties would hold the marital premises as "joint tenants with right of survivorship" until it was sold and that:

> [t]he marital residence shall be sold upon the first happening of any of the following events:
>
> 1) Youngest child's attainment of the age of 19;
>
> . . .
>
> Upon the first happening of any of the foregoing events, the Wife shall have the first option to purchase the interest of the Husband. Should the Wife not choose to exercise this option, the Husband shall then have the same option. If neither party desires to purchase the other's interest the Real Estate shall be listed with a licensed Real Estate broker to be sold and the Real Estate shall be sold. Upon payment from the proceeds of the sale of the house of the outstanding mortgage, Real Estate commissions, transfer tax, recording fees, reasonable attorney's fees, the Wife shall be responsible for all outstanding property taxes or entitled for a credit for overpayment. . . . Any debt/lien attaching to the property as a result of any action or inaction by Husband or Wife shall be deducted from that party's portion of the proceeds.[1]

On Jason's emancipation, James filed a post-judgment motion to compel the listing and sale of the property. Ginger filed a cross-motion to buy out James' interest for one-half of the $167,000 value that had been established by a broker's market analysis in 1996.

Ginger certified that her understanding was that the PSA gave her the right of first refusal at the 1996 value in return for her obligation to pay all of the carrying charges on the house although allowing James to take all of the tax benefits. James certified that he obtained the 1996 market analysis merely to assist him in deciding whether to sell to a third party at the time of the divorce. Furthermore, James contended that the tax benefits served to off-set the child support and the alimony he agreed to provide Ginger, and also as an acknowledgement of his decision to permit Ginger

---

[1] Although not stated, it appears that the parties agreed that the proceeds would be equally divided. No other option has been suggested by any party, and no contention to the contrary was advanced during the proceedings that led up to this appeal.

to live in the house until their youngest son reached nineteen years of age.

Without holding an evidentiary hearing, the trial judge ruled that Ginger's right to a buy-out was to be at current market value when exercised.[2] Ginger appealed, and the Appellate Division reversed, concluding that the PSA was ambiguous because it did not specify the price at which the parties could exercise their respective buy-out options. Because the parties offered conflicting proofs concerning the meaning of the provision, and because the panel found that James' attorney drafted the agreement, it held that "any ambiguity would be construed in Ginger's favor." Moreover, the panel stated that "[g]iving Ginger the benefit of all favorable inferences from the evidence, a factfinder could conclude that the agreement should be construed as she contends," and thus, a plenary hearing was required.

At the hearing, only James and Ginger testified. Their testimony was consistent with the facts each set forth in their prior certifications. James maintained that the 1996 market valuation was obtained to establish the value of the asset because he contemplated selling it at that time.[3] Ultimately, he chose not to do so because he did not want to uproot his sons. Therefore, he remained a co-owner of the house and allowed Ginger and their sons to live there. Furthermore, James testified that the parties never agreed to freeze Ginger's buy-out at the 1996 figure, and she made no concessions warranting such an outcome. Rather, the agreement was to sell the house at market value when one of the enumerated triggering events occurred.

Ginger reiterated her position that the parties agreed that she could purchase the house at the 1996 valuation upon the emancipa-

---

[2] The property was valued at $304,000 at the time of the motion, July 2003.

[3] The market valuation provided that:

Its purpose is to estimate the market value of the subject property as defined within the report. The function is to assist the client in valuation knowledge for possible disposition of real estate.

tion of her youngest son. Again, she explained that, in exchange for the insider price, among other things, she gave James the tax and mortgage interest deductions. She also pointed to a draft of the agreement that referenced the 1996 value.

At the plenary hearing, various drafts of the PSA were received into evidence.[4] James' attorney prepared the first draft. It provided that the marital residence would be sold upon the first happening of either the death of Ginger or the emancipation of the youngest son. Under that version, Ginger also had the first option to purchase the interest of James at the "best price attainable," an apparent reference to the current market value at the time of the triggering event.

Ginger's attorney prepared the second draft. That draft also contemplated Ginger's continued residence in the marital home. It read:

Husband agrees to convey to the wife by way of quantum deed all right, title, claim and interest he may have in and to the property. At that time the wife shall give to the husband a mortgage in the amount of one-half of the equity at the time of the divorce.

In other words, that draft provided that James would transfer the house to Ginger at the time of divorce subject to a mortgage securing his one-half interest in the house. In addition, on the emancipation of their youngest child, Ginger was entitled to "purchase the interest of [James]." If she chose not to do so, the house was to be sold. Ginger argued that under that version, James' interest was frozen at the 1996 value.

Because the parties apparently could not agree, James' lawyer drafted a third version. That draft was the basis for the final PSA, but was subject to further negotiation, as reflected in the numerous handwritten interlineations present in the final draft. It included the provision in the final PSA that is at issue here.

---

[4] There were many changes from draft to draft including the alimony and child support figures. Although only the details of the equitable distribution provisions regarding the matrimonial premises are recounted here, it is clear that the PSA was a fully negotiated work in progress with input from both sides.

After the plenary hearing, the trial judge concluded that the PSA was ambiguous and that, in accordance with the Appellate Division's instructions, the ambiguity had to be construed in Ginger's favor because James' lawyer drafted the contract. He also held "that plaintiff is to buy out defendant's interest in the marital residence for one-half of $167,000, less the mortgage balance on May 27, 2003." [5] In ruling, the judge made no findings regarding the parties' intentions or credibility.

James appealed, and the Appellate Division affirmed, reasserting its previous view that because the PSA did not establish value and two prior drafts referenced different values, the PSA was ambiguous and should be interpreted against James, whose lawyer drafted it. James filed a petition for certification that we granted. 188 *N.J.* 576, 911 *A.*2d 68 (2006).

## I.

James argues that the trial judge correctly supplied the valuation date in his initial judgment; that the Appellate Division erred in concluding the PSA was ambiguous; that even if the PSA was ambiguous, the Appellate Division required the trial judge to apply an entirely incorrect interpretative rationale; and that, at the very least, the case should be remanded for necessary credibility findings. Ginger counters that the evidence supported the 1996 valuation date and that the Appellate Division's decision to interpret the ambiguity against James, the drafter, was correct.

## II.

The basic contractual nature of matrimonial agreements has long been recognized. *Harrington v. Harrington,* 281 *N.J.Super.* 39, 46, 656 *A.*2d 456 (App.Div.1995) (citing *Petersen v. Petersen,* 85 *N.J.* 638, 642, 428 *A.*2d 1301 (1981); *Massar v. Massar,* 279 *N.J.Super.* 89, 93, 652 *A.*2d 219 (App.Div.1995)),

---

[5] No provision for interest was included.

*certif. denied,* 142 *N.J.* 455, 663 *A.*2d 1361 (1995). At the same time, "the law grants particular leniency to agreements made in the domestic arena," thus allowing "judges greater discretion when interpreting such agreements." *Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 542, 602 *A.*2d 741 (App.Div.1992).

As a general rule, courts should enforce contracts as the parties intended. *Henchy v. City of Absecon,* 148 *F.Supp.*2d 435, 439 (D.N.J.2001); *Kampf v. Franklin Life Ins. Co.,* 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960). Similarly, it is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties. *Tessmar v. Grosner,* 23 *N.J.* 193, 201, 128 *A.*2d 467 (1957). The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the "expressed general purpose." *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N.J.* 293, 302, 96 *A.*2d 652 (1953); *accord Dontzin v. Myer,* 301 *N.J.Super.* 501, 507, 694 *A.*2d 264 (App.Div.1997). That is the backdrop for our inquiry.

### III.

James argues that the trial judge was initially correct in supplying the 2003 valuation date, which James characterizes as a "missing" term. However, this is not a missing term case. Indeed, the Restatement Second of Contracts § 204 provides "[w]hen the parties to a bargain sufficiently defined to be a contract *have not agreed* with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Restatement (Second) of Contracts* § 204 (1981)(emphasis added). As that section and its commentary reveal, it is intended to be applied in cases in which the parties failed to agree regarding an issue, generally because they did not anticipate that it would arise or merely overlooked it. *Id.* § 204 cmts. (1981).

In the present case, neither party argues that no agreement existed regarding the valuation date when the PSA was executed.

On the contrary, both contend that, when they signed the agreement, there was a clear understanding between them regarding the buy-out value to be ascribed to the house. The problem is that they disagree, in retrospect, over what that understanding was. It thus fell to the trial judge to discern the parties' intent at the time of the divorce by probing their positions at an evidentiary hearing.

We understand the judge's initial inclination to rule that the 2003 value would apply in light of the fact that nothing in the PSA suggested otherwise. Had no conflicting certifications been filed, and had the parties been willing to stand or fall on the agreement itself, that might have been a fair approach. However, Ginger certified that the parties fully intended the 1996 value to be operative, that she made concessions to obtain that value, that a prior draft included that value and that, in effect, its absence was a scrivener's error.

James countered that Ginger did not make any concessions that would have justified the 1996 value and alleged that a sale at market value upon a triggering event was what was agreed upon. Under the circumstances, the judge had no alternative but to conduct an evidentiary hearing at which the parties' credibility could be assessed and their intentions gleaned. The Appellate Division was thus correct in ordering that hearing. We part company from the Appellate panel in connection with its concomitant instructions to the trial judge regarding the remand.

IV.

We turn first to the panel's direction that the trial judge apply the doctrine of contra proferentem. When a contract term is ambiguous, that rule of contract interpretation requires a court to adopt the meaning that is most favorable to the non-drafting party. *See* 5 *Corbin on Contracts* § 24.27 (Perillo ed., rev. ed. 1998). The doctrine may be utilized after a court has examined the terms of the contract, in light of the common usage and custom, and considered the circumstances surrounding its execu-

tion. If, at that time, the court is unable to determine the meaning of the term, contra proferentem may be employed as a doctrine of last resort. *See ibid.* The rationale behind that method of interpretation is that "[w]here one party chooses the term of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning." *Ibid.* Importantly, contra proferentem is only available in situations where the parties have unequal bargaining power. *Ibid.* If both parties are equally "worldly-wise" and sophisticated, contra proferentem is inappropriate. *See RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 *F.*2d 199, 203 n. 3 (1st Cir.1987).

 With those principles in mind, we conclude that the Appellate Division erred in several ways in directing the trial judge to apply the doctrine. First, the panel oversimplified the matrimonial settlement process by concluding that James' lawyer "drafted" the PSA. To be sure, James' lawyer drafted the first version. However, Ginger's lawyer drafted the second. Thereafter, James' lawyer drafted the third. The fourth and final draft was essentially the third draft with handwritten interlineations that reflected Ginger's changes. That is the way property settlement agreements are developed. Rarely is one party's version accepted without negotiation and input from the other. Thus, no singular "drafter" within the meaning of the doctrine of contra proferentem penned the agreement in this case. Second, the Appellate Division failed to recognize that, even if James' lawyer had drafted the PSA, the doctrine of contra proferentem is inapposite because a prerequisite to its application—unequal bargaining power—did not exist.

In short, the doctrine should not have been applied. That mistake caused the trial judge to elide the critical process of evaluating the parties' actual intentions and credibility, and in effect, to conclude that Ginger prevailed as a matter of law. That conclusion was erroneous. We thus reverse and remand the

matter to the trial judge to evaluate the evidence that was previously adduced at the hearing, this time, under the standards to which we have made reference. As we have said that does not include the doctrine of contra proferentem. Accordingly, all inferences need not be drawn in Ginger's favor.

Moreover, in conducting the proceedings, the judge should be mindful of the burden of persuasion. Ginger, as the cross-movant seeking to obtain judicial approval to exercise an option to purchase the marital home at the 1996 value, should bear the burden of establishing that that was the intent of the parties. The burden is allocated that way, not only because Ginger has invoked the jurisdiction of the court. Rather, where the sale of a marital asset is to abide a future event, for example the coming of age of a child, and no alternative is provided, current market value as of the time of the triggering event is presumed. Although overcoming a presumption only requires that a party satisfy the burden of going forward, *Ahn v. Kim*, 145 *N.J.* 423, 439, 678 *A*.2d 1073 (1996), Ginger should bear the ultimate burden of proof as well because, in effect, she is attempting to exclude $137,000 worth of joint marital property from distribution. Clearly, the burden of establishing immunity from distribution of a particular marital asset or portion of an asset rests upon the spouse who asserts it. *Landwehr v. Landwehr*, 111 *N.J.* 491, 504, 545 *A*.2d 738 (1988); *Painter v. Painter*, 65 *N.J.* 196, 214, 320 *A*.2d 484 (1974). Obviously, parties are free to exclude marital property from distribution by agreement. However, where there is no agreement or the existence of an agreement is challenged, the burden is as we have declared it to be.

If Ginger satisfies her burden, she is entitled to relief. If she does not, or if the evidence is in equipoise, her application should fail. The parties' credibility regarding their intentions at the time of the drafting of the PSA will be a pivotal factor on remand, and a close, textual analysis of the various drafts should aid in that determination.

It goes without saying that precise draftsmanship should be the polestar in every matrimonial settlement agreement. Otherwise, as here, the parties will continue to struggle over the underlying grievances of the marriage, long after the ink on the judgment of divorce has dried.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial judge for proceedings consistent with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

Opposed—None.