NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-1026-17T1
              A-1027-17T1

NEW JERSEY TRANSIT
CORPORATION,

      Plaintiff-Respondent,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON, MAIDEN
SPECIALTY INSURANCE
COMPANY, RSUI INDEMNITY
COMPANY, and WESTPORT
INSURANCE CORPORATION,

      Defendants-Appellants,

and

TORUS SPECIALTY INSURANCE
COMPANY,

      Defendant-Respondent,

and

HUDSON SPECIALTY
INSURANCE COMPANY and
IRONSHORE SPECIALTY
INSURANCE COMPANY,

      Defendants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **November 18, 2019** |
| **APPELLATE DIVISION** |

NEW JERSEY TRANSIT
CORPORATION,

      Plaintiff-Respondent,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON, MAIDEN
SPECIALTY INSURANCE
COMPANY, RSUI INDEMNITY
COMPANY, and WESTPORT
INSURANCE CORPORATION,

      Defendants-Respondents,

and

TORUS SPECIALTY INSURANCE
COMPANY,

      Defendant-Appellant,

HUDSON SPECIALTY
INSURANCE COMPANY, and
IRONSHORE SPECIALTY
INSURANCE COMPANY,

      Defendants.

_____

Argued October 8, 2019 – Decided November 18, 2019

Before Judges Yannotti, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6977-14. Robert W. Fisher (Clyde & Co US LLP) of the Georgia bar, admitted pro hac vice, argued the cause for appellants Certain Underwriters at Lloyd's,

London, Maiden Specialty Insurance Company, RSUI Indemnity Company, and Westport Insurance Corporation (Clyde & Co. US, LLP, attorneys; Robert W. Fisher, Anthony M. Tessitore, and Taylor L. Davis and James M. Bauer (Clyde & Co US LLP) of the Georgia bar, admitted pro hac vice, on the briefs).

Shawn L. Kelly and Michael J. Smith argued the cause for appellant StarStone Specialty Insurance Company f/k/a Torus Specialty Insurance Company (Dentons US, LLP, and Stewart Smith, attorneys; Shawn L. Kelly, Jonathan David Henry, Michael J. Smith, and Bryan W. Petrilla, of counsel and on the briefs).

Kenneth H. Frenchman and Marc T. Ladd (McKool Smith, PC) of the New York bar, admitted pro hac vice, argued the cause for respondent New Jersey Transit Corp. (McKool Smith, PC, attorneys; Robin L. Cohen, Kenneth H. Frenchman, Marc T. Ladd, and Alexander M. Sugzda (McKool Smith, PC) of the New York bar, admitted pro hac vice, on the brief).

The opinion of the court was delivered by

YANNOTTI, P.J.A.D.

New Jersey Transit Corporation (NJT) brought this action seeking a declaration regarding the coverage provided under its property insurance program for water damage that occurred during Superstorm Sandy. The trial court found that the $100 million flood sublimit in the policies did not apply to NJT's claim, and NJT was entitled to coverage up to the full $400 million policy limits for the Sandy-related water damage. The trial court also found that defendant insurers had not submitted sufficient evidence to support their

claims for reformation of the policies. Accordingly, the court entered an order dated September 18, 2017, granting summary judgment in favor of NJT, and denying the insurers' motions for summary judgment.

In A-1026-17, Certain Underwriters At Lloyd's, London (Lloyd's), Maiden Specialty Insurance Company (Maiden), RSUI Indemnity Company (RSUI), Specialty Insurance Company (Specialty), and Westport Insurance Corporation (Westport) appeal from the September 18, 2017 order. In A-1027-17, Torus Specialty Insurance Company (Torus) also appeals from the September 18, 2017 order. We address both appeals in this opinion.[1] For the reasons that follow, we affirm.

I.

In July 2012, NJT, through its insurance broker, Marsh USA Inc. (Marsh), secured coverage from eleven insurers in a multi-layered property insurance policy program for the policy period from July 1, 2012, to July 1, 2013. The policies insured against "all risks" and provided coverage proportionally in four layers. Lexington Insurance Company (Lexington) provided coverage in the primary layer and was responsible for the first $50 million of insurance.

---

[1] We refer herein to Lloyd's, Maiden, RSUI, Specialty, and Westport collectively as "Certain Insurers."

After the primary layer was exhausted, the policies provided three layers of excess coverage. The second layer provided coverage up to $100 million, and the third layer provided an additional $175 million. The fourth layer provided coverage of $125 million, resulting in a property insurance program with $400 million of coverage.

Certain Insurers and Torus provided excess coverage in the third or fourth excess layers, or both. Hudson Specialty Insurance Company (Hudson), Ironshore Specialty Insurance Company (Ironshore), and Arch Specialty Insurance Company (Arch) also provided excess coverage. The policies of all participating insurers included a standard policy form and separate endorsements, some of which were included in all policies, and some which were unique to specific insurers.

The policies cover all perils and damage to NJT's property unless specifically excluded. In addition, section two of the standard policy form, entitled "limit of liability," sets forth twenty-seven categories of losses for which coverage is subject to "100% per occurrence ground-up sublimits." The terms "sublimit" and "ground-up" are not defined in the policies, but these terms are commonly used in the insurance industry.

"A 'sublimit' is a limit within the aggregate limit for a certain type of risk . . . ." David Navetta, The New Privacy Insurance Coverage, 3 No. 1.

A-1026-17T1

ABA SciTech Law 14, 17, n.3 (2006). When a sublimit applies, the loss is covered only up to the amount of the sublimit rather than up to the amount of the aggregate limit. Ibid. Furthermore, in a "ground-up" multi-layered policy program, "a given layer of coverage is not implicated until the layer beneath it is completely exhausted." New Hampshire Ins. v. Clearwater Ins., 129 A.D.3d 99, 106 (N.Y. App. Div. 2015) (quoting North River Ins. v. ACE Am. Reinsurance Co., 361 F.3d 134, 138 n.6 (2d Cir. 2004)).

The flood sublimit in section two of the standard policy form limits liability for "losses caused by flood" to $100 million "per occurrence." In Certain Insurers' policies and the Torus policy, "flood" is defined as:

> [A] temporary condition of partial or complete inundation of normally dry land from:
>
> 1. The overflow of inland or tidal waters outside the normal watercourse or natural boundaries[;]
>
> 2. The overflow, release, rising, back-up, runoff or surge of surface water; or
>
> 3. The unusual or rapid accumulation or runoff of surface water from any source.
>
> [S]uch . . . flood shall be deemed to be a single occurrence within the meaning of this policy.

The policies also state that "[e]ach loss by . . . flood shall constitute a single loss[,]" if:

(2) . . . any flood occurs within a period of the continued rising or overflow of any river(s) or stream(s) and the substance of same within the banks of such river(s) or stream(s) or the unusual and rapid accumulation or runoff of surface waters; or

(3) . . . any flood results from any tsunami, tidal wave, or seismic sea waves or series thereof caused by any one disturbance.

The term "occurrence," which appears in section two of the standard policy form, is defined in the Occurrence Limit of Liability Endorsement (OLLE). The OLLE states:

The limit of liability of Insurance shown on the face of this policy, or endorsed on to this policy, is the total limit of the Company's liability applicable to each occurrence, as hereafter defined. Notwithstanding any other terms and conditions of this policy to the contrary, in no event shall the liability of the company exceed this limit or amount irrespective of the number of locations involved.

The term "occurrence" shall mean any one loss, disaster, casualty or series of losses, disasters, or casualties, arising out of one event. When the term applies to loss or losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake, volcanic eruption, riot, riot attending a strike, civil commotion, and vandalism and malicious mischief one event shall be construed to be all losses arising during a continuous period of 72 hours. When filing proof of loss, the insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the first loss to the covered property occurs.

A-1026-17T1

Section fourteen of Certain Insurers' policies defines the term "[n]amed windstorm."  This provision was added to the policies that were to be in effect from July 1, 2012, to July 1, 2013.  It states:

> "Named Windstorm" shall mean wind or wind driven water, storm surge and flood associated with, or which occurs in conjunction with, a storm or weather disturbance which is named by the National Weather Service or any other recognized meteorological authority.
>
> Such storm or weather disturbance shall be considered to be a Named Windstorm until the time such storm or weather disturbance has been downgraded, meaning that the storm or weather condition is no longer considered by the U.S. National Weather Service or any other recognized meteorological authority to be a hurricane, typhoon, tropical storm or cyclone.

Endorsement four of the Torus policy pertains to "named windstorm" and states:

> Named windstorm shall mean direct action of wind including ensuing storm surge when such wind/storm surge is associated with, or occurs in conjunction with a storm or weather disturbance which is named by the National Oceanic and Atmospheric Administration's (NOAA) National Hurricane Center or similar body until sustained wind speeds drop below the parameter for naming storms.
>
> Storm surge is defined as water driven inland from coastal waters by high winds and low atmospheric pressure.

A-1026-17T1

On October 29, 2012, Superstorm Sandy struck New Jersey, causing significant damage to NJT's properties. After the storm, NJT promptly notified Marsh and the insurers of its losses. NJT's employees, Marsh, and loss adjuster York Risk Services Group, Inc. (York) arranged for the inspection of the damaged properties and a valuation of the equipment that had to be repaired or replaced. Thereafter, Marsh sought a determination as to the amount of coverage provided for the Sandy-related water damage to NJT's properties.

In April 2013, Terry S. Lubin, Executive General Adjuster for York, wrote NJT on behalf of Certain Insurers, Torus, and other excess carriers. Lubin stated that NJT's claimed losses for water damage were limited by the $100 million flood sublimit in the policies, and the excess carriers would pay no more than $50 million in addition to the first-layer coverage provided by Lexington.

Marsh later advised York that NJT disagreed with the excess insurers' interpretation of the policies. Marsh explained that none of the sublimits in the policies applied to losses caused by a "named windstorm," which was a separately defined peril. Marsh asserted that NJT was entitled to the full $400 million in coverage under the program for its Sandy-related property damage.

A-1026-17T1

Arch, which provided coverage in the second, third, and fourth layers of the program, informed NJT it would not apply the flood sublimit to NJT's property damage claim. Arch agreed to pay its proportional share of NJT's losses above the $100 million flood sublimit.

In October 2014, NJT filed this action against Lloyd's, Maiden, RSUI, Torus, Westport, Hudson, and Ironshore. NJT sought a judgment declaring that the $100 million flood sublimit did not apply to its claims for property damage associated with Superstorm Sandy, and defendants were in anticipatory breach of their insurance contracts. Certain Insurers and Torus filed answers asserting that they had no contractual obligation to provide coverage for any water-related damage caused by "flood" that exceeded $100 million.

Certain Insurers and Torus later amended their answers to assert counterclaims for reformation of their policies. The trial court stayed proceedings on NJT's claims against Hudson pending arbitration, pursuant to a provision in Hudson's policy. In March 2017, the trial court granted NJT's motion to vacate the stay and confirm the arbitration award.

After the completion of discovery, NJT, Certain Insurers, and Torus filed motions for summary judgment. On August 24, 2017, the Law Division judge heard oral argument and placed his decision on the record. The judge

granted NJT's motion and denied Certain Insurers' and Torus's motions.  The judge memorialized his decision in an order dated September 18, 2017.[2]  These appeals followed.

## II.

On appeal, Certain Insurers and Torus argue that the trial court erred by granting NJT's motion for summary judgment.  They contend the water damage to NJT's properties, which occurred during Superstorm Sandy, were "losses caused by flood," and therefore are subject to the $100 million flood sublimit in the policies.

"An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge."  Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).  Our court rules provide that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46-2(c).

"If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a

---

[2]  Although Ironshore sought summary judgment along with Certain Insurers, it has not appealed from the trial court's September 18, 2017 order.

A-1026-17T1

'genuine' issue of material fact for purposes of Rule 4:46-2." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). The court "should not hesitate to grant summary judgment" if "the evidence 'is so one-sided that one party must prevail as a matter of law.'" Ibid. (quoting Liberty Lobby, 477 U.S. at 252).

Where, as in this case, the issue raised on appeal involves the interpretation of a contract and the application of case law to the facts of the case, we review the trial court's decision de novo. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cantone Research, Inc., 427 N.J. Super. 45, 57 (App. Div. 2012). In doing so, we accord no "special deference" to the trial court's "interpretation of the law" or its judgment on the "legal consequences that flow from established facts . . . ." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Here, the trial court found that there was no genuine issue of material fact that pertains to the interpretation and application of NJT's insurance policies. The record supports the court's determination. It is undisputed that during Superstorm Sandy, a surge of water inundated and damaged various NJT properties. Dr. Philip Orton, NJT's expert, opined that Sandy's record-setting storm surge caused the flooding of various NJT sites. In addition, Dr. Lee E. Branscome, the expert for Certain Insurers, opined that the storm surge

occurred simultaneously with the flooding "and was an inseparable part of the flood event."

Thus, the question raised on appeal is whether the Sandy-related water damage to NJT's properties is subject to the $100 million flood sublimit, or whether the policies provide coverage for such damage up to the $400 million limit of NJT's insurance program. In addressing this legal issue, we are guided by the general principle that insurance policies must be analyzed under the rules of contract law. Cypress Point Condominium Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (citing Kampf v. Franklin Life Ins., 33 N.J. 36, 43 (1960)).

To determine the meaning of a provision in an insurance policy, we first consider the plain meaning of the language at issue. Chubb Custom Ins. v. Prudential Ins. Co. of Am., 195 N.J. 231 (2008) (citing Zacarias v. Allstate Ins., 168 N.J. 590, 594-95 (2001)). We must read the contract as a whole "in a fair and common sense manner." Cypress Point, 226 N.J. at 415 (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)). The court must "give effect to the whole policy, not just one part of it." Id. at 416 (quoting Arrow Indus. Carriers, Inc. v. Cont'l Ins. Co. of N.J., 232 N.J. Super. 324, 334 (Law Div. 1989)).

Our goal in interpreting the policies is to "discover the intention of the parties[,]" by considering "the contractual terms, the surrounding

circumstances, and the purpose of the contract." Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993). Moreover, "if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." Cypress Point, 226 N.J. at 416 (quoting Butler v. Bonner & Barnewell, Inc., 56 N.J. 567, 575 (1970)).

III.

Certain Insurers and Torus argue that the Sandy-related inundation of NJT's properties met two separate definitions of "flood" in the policies. They assert NJT's properties were damaged by either "[t]he overflow, release, rising, back-up, runoff or surge of surface water;" or "[t]he unusual or rapid accumulation or runoff of surface water from any source." Defendants therefore contend the water damage to NJT's properties were "losses caused by flood," which are subject to the $100 million flood sublimit in the policies. We disagree.

Here, the trial court correctly determined that the losses at issue are not subject to the $100 million flood sublimit. As stated previously, the flood sublimit in the policies applies to "losses caused by flood." The policies define "flood" to include the "surge of surface water," as well as "the rapid accumulation or runoff of surface water from any source."

14

However, the Certain Insurers' policies separately define "named windstorm" to include "wind driven water, storm surge and flood associated with, or which occurs in conjunction" with a "named windstorm." Similarly, the Torus policy defines "named windstorm" to mean the "direct action of wind including storm surge when such wind/storm surge is associated with or occurs in conjunction with" a named windstorm.

The policies do not define "flood" to include "storm surge" and "wind driven water" associated with such a "named windstorm." Although the definition of "flood" includes "surge," the definition of "named windstorm" more specifically encompasses the wind driven water or storm surge associated with a "named windstorm." Where, as here, two provisions of an insurance policy address the same subject, "the more specific provision controls over the more general." See Homesite Ins. v. Hindman, 413 N.J. Super. 41, 48 (App. Div. 2010).

Furthermore, if the parties had intended that damage from a "storm surge" would be subject to the flood sublimit, the policies would have stated so in plain language. Moreover, if the term "flood" already included damage from a "storm surge" associated with a "named windstorm," as defendants claim, there would have been no need for the parties to include the "named windstorm" provision in the policies.

In support of their arguments on appeal, defendants place great weight on the flood sublimit, which applies "per occurrence" to all losses "caused by flood." Defendants contend the OLLE combines all windstorm, flood, and other perils in a single event or "occurrence" for purposes of applying the flood sublimit.

Although the OLLE provides that "losses" caused by certain perils are to be considered a single event or "occurrence," the OLLE does not address whether the Sandy-related damage to NJT's properties was damage "caused by flood" or damage resulting from a "named windstorm." In addition, the OLLE does not expressly provide that damage caused by a "flood" and damage from a "named windstorm" are to be treated as a single event or "occurrence" for purposes of applying the flood sublimit.

Defendants further argue the flood sublimit applies to NJT's Sandy-related property damage because there is no provision in the policies that specifically removes "storm surge" from the definition of "flood," and no provision that states the flood sublimit does not apply to the inundation of property associated with a "named windstorm."

In support of this argument, defendants rely upon a provision of the policies that pertains to "earthquake and flood." This provision states:

> Flood, as defined in this policy, that would not have occurred but for an Earth Movement as described herein, shall be deemed to be proximately caused by Earth Movement regardless of any other cause or

16

event that contributes concurrently or in any sequence to such Flood, and consequently shall be considered Earth Movement.

Defendants contend a similar provision was required in order to remove water damage resulting from a "named windstorm" from the flood sublimit. We are convinced, however, that the relevant provisions of the policies are sufficiently clear and establish that water damage associated with a "named windstorm" does not come within the definition of "flood" and is not subject to the flood sublimit.

Certain Insurers also contend the parties never intended that the "named windstorm" provision would remove water damage associated with a "named windstorm" from the flood sublimit. They assert the "named windstorm" provision merely gives "shape to a particular type of event," which is to emphasize that all losses arising from a "named windstorm" are those that occur in a single, seventy-two-hour period.

We cannot agree. The plain language of the policies indicates that the purpose of the "named windstorm" definition was to differentiate between the inundation caused by a "surge" of water, which may have no relationship to a storm, and the inundation resulting from a "storm surge," which the policies define as wind driven water associated with a "named windstorm."

A-1026-17T1

Accordingly, we are convinced the plain language of the policies provides that water damage resulting from a "storm surge" associated with a "named windstorm" does not fall within the definition of "flood." Therefore, the water damage to NJT's properties that occurred during Superstorm Sandy is not subject to the $100 million flood sublimit.

IV.

The decision in SEACOR Holdings, Inc. v. Commonwealth Insurance, 635 F.3d 675 (5th Cir. 2011), supports our interpretation of the policies. In SEACOR, the insured had an all-risk policy, which included deductibles that were based on the source of the damage. Id. at 677. One of the deductibles applied to a loss directly caused by the peril of "named windstorm," and another deductible applied to a loss caused directly by the peril of flood. Id. at 678. The policy provided an aggregate limit of liability for loss caused by flood. Ibid.

The plaintiff's properties had been damaged significantly during a named hurricane. Ibid. The insurer applied both deductibles to the plaintiff's claim. Id. at 680. The Fifth Circuit held that the hurricane was the proximate cause of the plaintiff's water-related damage, even though there were other contributing factors. Id. at 682. Therefore, only the deductible for "named windstorm" applied. Id. at 682-83.

The court stated that the damages were caused by a named windstorm and therefore did not "trigger" the flood limit of liability. Id. at 683. This was so "because such losses were not caused by the peril of [f]lood." Ibid. The same reasoning applies in this case. Because the water damage to NJT's properties was caused by a "named windstorm" rather than "flood," as those terms are defined in the policies, the flood sublimit does not apply.

Defendants rely, however, on National Railroad Passenger v. Arch Specialty Insurance, 124 F. Supp. 3d 264, 273 (S.D.N.Y. 2015) (Amtrak).[3] In that case, Amtrak sought coverage for property damage that arose in the aftermath of Superstorm Sandy. Id. at 266. Amtrak had all-risk policies issued by various insurers, which included a $125 million sublimit for flood and earthquake. Id. at 267. Most of the policies defined "flood" as "a rising and overflowing of a body of water onto normally dry land." Ibid. Other policies defined "flood" to include a "surge of surface water . . . ." Ibid.

The district court noted that Sandy had generated a "storm surge" that drove water from the rivers around Manhattan onto the shore and inundated Amtrak's tunnels under the East River. Ibid. The water damaged Amtrak's equipment. Id.

---

[3] The Court of Appeals affirmed the district court's determination regarding the application of the flood sublimit in an unpublished opinion. Nat'l R.R. Passenger Corp. v. Aspen Specialty Ins., No. 15-2358, 2016 U.S. App. LEXIS 16074, at *13 (2d Cir. Aug. 31, 2016).

at 268. In addition, after the water was pumped from the tunnels, it left behind a residue of "chlorides," which caused additional damage. Ibid.

The court held that the definitions of "flood" in the policies unambiguously encompassed the inundation of normally dry land caused by a storm surge. Id. at 269. The court noted that the parties had agreed a storm surge "pushes water beyond its usual borders and onto normally dry land." Ibid.

The court rejected Amtrak's contention that a loss from the peril of flood is different from the inundation caused by a storm surge or wind driven water. Id. at 270-71. The court found that Amtrak's interpretation of the policies "cannot be reconciled with the plain language of the policies." Id. at 271.

We are convinced defendants' reliance upon the Amtrak decision is misplaced. In Amtrak, the court distinguished the policies at issue with policies that include "storm surge" within the definition of "named windstorm." Id. at 272. The court emphasized that Amtrak's policies did not provide that floods associated with a "named windstorm" are to be treated differently from other floods. Ibid.

Here, the policies in NJT's program provided a definition of "named windstorm," which includes "wind or wind driven water, storm surge and flood associated with" such storms. Therefore, the policies plainly provide that water damage associated with a "named windstorm" are to be treated

differently from "losses caused by flood." Therefore, such losses are not subject to the flood sublimit.

In addition, defendants rely upon Six Flags, Inc. v. Westchester Surplus Lines Insurance, 565 F.3d 948 (5th Cir. 2009). There, the plaintiff obtained multi-layered, all-risk, first-party property insurance for its theme parks, with a primary layer providing coverage of $25 million and other layers providing excess coverage. Id. at 951. The polices included a flood sublimit that capped liability at $2.5 million for the first layer of excess coverage, and $27.5 million for the second layer. Id. at 952.

The policies defined "Weather Cat Occurrence," to mean "[a]ll loss or damage occurring during a period of [seventy-two] hours which is . . . named by the National Weather Service or any other recognized meteorological authority." Id. at 953. The policies also stated that the term "[s]torm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including but not limited to [f]lood, wind, hail, sleet, tornadoes, hurricane or lightning." Ibid.

The plaintiff's property sustained heavy damage during Hurricane Katrina and the plaintiff submitted losses totaling $150 million to the insurers. Ibid. The primary-layer carriers paid the plaintiff $25 million; however, the excess carriers applied the flood sublimit and capped their liability at $2.5 million. Ibid. The

court held that the flood sublimit applied because the definition of "occurrence" in the policies grouped certain losses for adjustment purposes. Id. at 957. The court found that an "occurrence" is "distinct from the concept of a peril, which is the cause of the loss." Ibid.

Defendants' reliance upon Six Flags also is misplaced. Here, the definition of "occurrence" in the policies groups losses pertaining to certain perils. However, the flood sublimit only applies to "losses caused by flood." Under NJT's policies, losses caused by a "storm surge" associated with a "named windstorm" are not "losses caused by flood," and are not subject to the flood sublimit. Thus, Six Flags does not support defendants' interpretation of the policies.

V.

On appeal, NJT argues that even were we to conclude that NJT's losses were caused by both a "flood" and a "named windstorm," it would nevertheless be entitled to coverage under New Jersey's efficient proximate cause doctrine. We agree.

When there is a conflict as to whether, for coverage purposes, losses should be considered to be "caused by" an excluded risk or by a covered peril, the New Jersey courts employ the efficient proximate cause test, which is sometimes referred to as Appleman's Rule. See generally Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J. Super. 537, 543-46 (App. Div. 1993)

(discussing and applying Appleman's Rule). Accord Zurich Am. Ins. v. Keating Bldg. Corp., 513 F. Supp. 2d 55, 70 (D.N.J. 2007); Flomerfelt v. Cardiello, 202 N.J. 432, 447 (2010); Auto Lenders Acceptance Co. v. Gentilini Ford, Inc., 181 N.J. 245, 257-58 (2004).

Under this test, if an exclusion "bars coverage for losses caused by a particular peril, the exclusion applies only if the excluded peril was the 'efficient proximate cause' of the loss." Zurich, 513 F. Supp. 2d at 70 (emphasis added) (quoting Auto Lenders, 181 N.J. at 257). "Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss . . . ." Auto Lenders, 181 N.J. at 257 (quoting 5 John Alan Appleman, Insurance Law & Practice § 3083 at 309-11 (1970)).

Here, the "storm surge" associated with Superstorm Sandy was a "peril specifically insured against . . . ." Auto Lenders, 181 N.J. at 257. Because Sandy's "storm surge" caused, "in an unbroken sequence," any losses that might otherwise not be covered under the flood sublimit, the storm surge is "regarded as the proximate cause of the entire loss." Ibid.

Defendants argue, however, that the efficient proximate cause doctrine does not apply here. They advance several reasons for their argument.

First, Certain Insurers contend the policies excluded application of the efficient proximate cause doctrine because they include a "single loss" clause. An anti-concurrent causation or anti-sequential causation clause will "exclude coverage when a prescribed excluded peril, alongside a covered peril, either simultaneously or sequentially, causes damage to the insured." Simonetti v. Selective Ins., 372 N.J. Super. 421, 431 (App. Div. 2004). The single-loss clause in NJT's policies does not exclude coverage for losses occasioned by a sequence of causes, some of which are included and some of which are not. Therefore, it is not an anti-sequential causation clause.

Next, Certain Insurers argue that the efficient proximate cause doctrine does not apply because the policies were negotiated by a sophisticated insured that used the services of a professional broker. They assert that "if a rule" of interpretation, including the efficient proximate cause doctrine, "favors the insured, it cannot apply where a sophisticated insured like [plaintiff] negotiated the [p]olicies."

In support of this argument, Certain Insurers cite Chubb Custom. In that case, the Court stated that "the rules tending to favor an insured that has entered into a contract of adhesion are inapplicable where . . . both parties are sophisticated commercial entities with equal bargaining power." Chubb Custom, 196 N.J. at 246 (citing Pacifico v. Pacifico, 190 N.J. 258, 267-68 (2007)).

24

However, <u>Chubb Custom</u> does not support Certain Insurers' argument.  That case dealt with the application of <u>contra proferentem</u>, which applies when the court finds contract terms ambiguous.  <u>Id.</u> at 238 (citing <u>Pacifico</u>, 190 N.J. at 258, 268).  The court then "generally will adopt the meaning that is most favorable to the non-drafting party if the contract was the result of negotiations between parties of unequal bargaining power."  <u>Ibid.</u> (citing <u>Pacifico</u>, 190 N.J. at 258, 268).

<u>Chubb Custom</u> does not address the efficient proximate cause doctrine.  Moreover, there is no provision in NJT's policies which expressly precludes application of the doctrine to losses caused by "flood" and losses resulting from a "storm surge" associated with a "named windstorm."

In addition, endorsement one in the standard policy states that the parties understand and agree that New Jersey law would apply to "[a]ny dispute concerning the interpretation of the terms, conditions, limitations and/or exclusions . . . ."  New Jersey law applies the efficient proximate cause doctrine.  <u>Search EDP</u>, 267 N.J. Super. at 543-46.

Certain Insurers and Torus also contend the efficient proximate cause doctrine does not apply to "all-risk" policies because it is always possible to look back to a remote event in a chain of causation and find a covered peril.  According to defendants, this would allow the insured to avoid application of the flood sublimit and defeat the purpose of having exclusions.

A-1026-17T1

Defendants were free, however, to negotiate the terms of a policy that specifically precluded the application of the efficient proximate cause doctrine when damage is caused by "flood" and a "storm surge" associated with a "named windstorm." They did not do so. As we stated previously, the court cannot make a new and better contract for defendants than they made for themselves. Cypress Point, 226 N.J. at 415 (quoting Kampf, 33 N.J. at 43).

Certain Insurers also argue the efficient proximate cause doctrine only applies "to exclusions, not sublimits." Again, we disagree. The flood sublimit bars coverage for losses "caused by flood" that exceed $100 million. The sublimit therefore excludes coverage for certain claims. Moreover, Certain Insurers has not offered any persuasive reason for treating a sublimit differently from other exclusions for purposes of applying the efficient proximate cause doctrine.

Accordingly, we conclude that if NJT's losses are deemed to have been caused both by "flood" and by a storm surge associated with a "named windstorm," and the efficient proximate cause doctrine is applied, NJT's claims for Sandy-related water damage would not be subject to the $100 million flood sublimit in the policies.

VI.

26

Although Certain Insurers and Torus argue that relevant policy provisions are clear, they alternatively argue that certain extrinsic evidence created a genuine issue of material fact that precluded the grant of summary judgment to NJT on the coverage issue. They assert the extrinsic evidence raises a genuine issue as to whether the parties intended that the water damage from a "storm surge" would be subject to the flood sublimit.

Disputes concerning intent or credibility ordinarily should not be resolved on summary judgment. McBarron v. Kipling Woods, LLC, 365 N.J. Super. 114, 117 (App. Div. 2004). However, if "[t]he facts needed to interpret the contract are not in dispute . . . , under ordinary circumstances the court should award summary judgment . . . and require specific performance of the contract." Kilarjian v. Vastola, 379 N.J. Super. 277, 283 (Ch. Div. 2004).

Here, there is no genuine issue of material fact relevant to the interpretation and application of the flood sublimit. We have determined as a matter of law that under the plain language of the policies, NJT's losses resulting from the "storm surge" associated with Superstorm Sandy are not subject to the sublimit for "losses caused by flood."

We therefore conclude the trial court was not required to consider the extrinsic evidence proffered by defendants and the court did not err by granting summary judgment on the coverage issue.

VII.

In its appeal, Torus argues that if we conclude the flood sublimit does not apply to NJT's losses, it presented sufficient evidence for reformation of its policy on the basis of equitable fraud. Torus therefore contends the trial court erred by granting summary judgment to NJT on its reformation claim.[4]

"The general rule with respect to the reformation of contracts applies equally to insurance policies:  relief will be granted only where there is mutual mistake or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." Heake v. Atl. Cas. Ins., 15 N.J. 475, 481 (1954). Accord Phillips v. Metlife Auto & Home/Metro. Grp. Prop. & Cas. Ins., 378 N.J. Super. 101, 104 (App. Div. 2005). "Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981).

A party claiming equitable fraud need not establish that the perpetrator knew the falsity of the misrepresentation. Ibid. Instead, the party must establish, by "clear and convincing evidence," that: (1) a party made a

---

[4] We note that in the trial court, Certain Insurers also sought reformation of their policies. However, on appeal, these defendants have not challenged the trial court's grant of summary judgment to NJT on their reformation claims.

misrepresentation or omission of material fact; (2) knowing the falsity of the statement; (3) intending that the misrepresentation or omission be relied upon; (4) resulting in the injured party's reasonable reliance; and (5) damages. DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013) (citing Jewish Ctr., 86 N.J. at 624).

Here, Torus alleges that Marsh masked its "intention [of] increas[ing] coverage limits . . . [with] the named windstorm definition . . . ." Torus claims Marsh highlighted the changes to the terms of the expiring policy, but failed to highlight the "named windstorm" section in the new policy that would be in effect from July 1, 2012, to July 1, 2013. Torus further alleges that Marsh "falsely stat[ed] that the named windstorm definition was required to be included . . . solely for 'concurrency' purposes," and that Marsh "misrepresent[ed]" that the flood sublimit "would remain applicable."

We are not persuaded by Torus's contention that it presented sufficient evidence to support its claim for reformation of its policy. Here, Torus claims Nicholas Trent, a Marsh underwriter, told Torus underwriter Michael Argenziano that the "named windstorm" definition would be added to the policies solely for "concurrency" purposes.

Assuming that Trent made that statement, it was not a factual representation regarding the scope of coverage, and it was not false.

Moreover, Argenziano stated that he understood "concurrency" to mean "the same language" in all the policies providing excess coverage. The "named windstorm" definitions in the policies are, in fact, essentially the same.

Torus further alleges that Trent "misled" Argenziano "to believe that the named windstorm definition would not affect the [f]lood [s]ublimit at all." However, Torus has not presented any evidence showing that Trent or any other Marsh agent made a specific statement, which misrepresented the effect the "named windstorm" definition would have on the flood sublimit.

Therefore, Torus's reformation claim is not based on any affirmative misrepresentations. Instead, the claim is based on the allegation that Marsh failed to disclose material facts about the "named windstorm" definition and the flood sublimit. See Jewish Ctr., 86 N.J. at 624.

In support of that claim, Torus relies on statements that Argenziano made to Trent. Torus asserts that Argenziano repeatedly informed Trent he could not underwrite more than $5 million in flood coverage. Torus claims Trent "knowingly permitted" Argenziano to proceed with that "false understanding."

Although "[s]ilence in the face of a duty to disclose may constitute a fraudulent concealment" in certain circumstances, we have limited the duty to disclose in the commercial context to "three general classes of transactions

30

. . . ." United Jersey Bank v. Kensey, 306 N.J. Super. 540, 551 (App. Div. 1997).   "The first involves fiduciary relationships such as principal and agent or attorney and client."  Ibid.  The second relates to circumstances in which either party "expressly reposes . . . a trust and confidence in the other."  Ibid. The third relates to "contracts or transactions which in their essential nature, are 'intrinsically fiduciary,' and . . . 'necessarily call[] for perfect good faith and full disclosure . . . .'"  Ibid. (quoting Berman v. Gurwicz, 189 N.J. Super. 89, 94 (Ch. Div. 1981)).

Here, there is no basis for recognizing a duty on the part of Marsh to make any specific disclosures regarding the effect the addition of the "named windstorm" definition would have on the flood sublimit.  Marsh and Torus did not have a principal and agency relationship.  Furthermore, Marsh was acting on behalf of NJT, and was engaged in arms-length negotiations with the insurers for renewal of NJT's property insurance program.

Moreover, Marsh and Torus did not have a relationship in which either reposed "trust and confidence" in the other.  In addition, the insurance policies were not contracts of a fiduciary nature, and did not necessarily require "perfect good faith and full disclosure . . . ."  Ibid.

Thus, neither NJT nor Marsh had a duty to explain the significance of the "named windstorm" definition or any other provision in the policies to

A-1026-17T1

Torus. Rather, Torus and its underwriters had an obligation to read those terms before agreeing to participate in the program and provide coverage. See Aden v. Fortsh, 169 N.J. 64, 86 (2001) (noting that if a contracting party fails to read the contract before agreeing to its terms, the party cannot later claim the agreement was different from that which was expressed in writing).

Therefore, viewing the evidence in the light most favorable to Torus, we are convinced the trial court did not err by granting summary judgment to NJT on Torus's reformation claim. We conclude the evidence pertaining to this claim was "so one-sided" that NJT was entitled to prevail as a matter of law. Brill, 142 N.J. at 540 (quoting Liberty Lobby, 477 U.S. at 252).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION