**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2016-18T4

MARY DOHERTY,

     Plaintiff-Respondent,

v.

MATTHEW J. DOHERTY,

     Defendant-Appellant.

_____

> Argued February 6, 2020 – Decided February 28, 2020
>
> Before Judges Nugent and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-0346-18.
>
> Jeffrey W. Goldblatt argued the cause for appellant.
>
> Susan M. Markenstein argued the cause for respondent (Markenstein Law, LLC, attorneys; Susan M. Markenstein, of counsel and on the brief).

PER CURIAM

Defendant Matthew J. Doherty appeals from the December 10, 2018 order of the Family Part enforcing a property settlement agreement (PSA) executed by the parties and the January 7, 2019 final judgment of divorce incorporating the terms of the PSA. We affirm.

## I.

Plaintiff Mary Doherty and defendant were married in 1988. The couple's two children were adults at the time of the divorce. Plaintiff, who has a master's degree in education administration, has been employed as a teacher for nearly thirty years. In the final years of the marriage, she earned approximately $90,000 per year. She maintained a pension and a retirement account.

Defendant, who has a bachelor's degree in economics, worked at a firm that repaired boat propellers, earning approximately $62,000 a year. Defendant left that position in 2003 and started a boat propeller repair business, which he testified generated about $30,000 a year in profits. Plaintiff, however, claims defendant had additional unreported cash earnings. He did not file tax returns for tax years 2014 through 2017 and was making monthly payments to the Internal Revenue Service (IRS) for unpaid taxes for tax years prior to 2014.[1]

---

[1] After 2009, the parties filed separate tax returns because plaintiff did not want to be associated with defendant's business practices.

Defendant left the marital home in March 2014. The parties dispute the cause and exact date of the separation, but it is undisputed defendant has not had a permanent residence since leaving the marital home.

In the months after the separation, the parties exchanged telephone calls and texts regarding the dissolution of the marital estate. On October 17, 2014, defendant agreed to transfer his interest in the marital home to plaintiff. Testimony revealed the motivation behind the transfer was defendant's concern the IRS would place a lien on the property to satisfy his unpaid taxes.

The parties signed the PSA on November 20, 2014, nearly three years prior to plaintiff filing a complaint for divorce. The agreement provides the parties waive any right to alimony and affirms the transfer of the marital home to plaintiff. The PSA also provides defendant will assume responsibility for $13,600 in credit card debts. While the PSA notes one of the parties has a business and one has a pension, it does not distribute either of those assets. The PSA does not mention defendant's obligation to provide support for the couple's youngest child, who was enrolled in college when the agreement was signed.

The parties provided varying versions of the negotiations resulting in the PSA. Defendant testified he was coerced into signing the agreement by constant phone calls from plaintiff, up to as many as fifty a day. Plaintiff denied this, but

3

acknowledged she called him often to discuss their children and the division of marital assets, and that he frequently ignored her calls, requiring additional attempts to contact him.

On the day the PSA was signed, the parties, who were not represented by counsel, met at a bank selected by defendant because he knew a notary public who worked. When asked by the notary if he had read the PSA, defendant stated he had not and did not wish to do so.

Defendant testified he was feeling suicidal on the day he signed the PSA and did not care about the terms of the agreement because he "wasn't [going to] be there the next day." Plaintiff testified that on the day the parties signed the PSA, she did not notice anything about defendant which would lead to a heightened concern for his well-being. Defendant admitted he did not feel suicidal shortly after the meeting and has never been diagnosed with a mental illness.

Evidence in the record, including the testimony of plaintiff's cousin, indicates defendant reaffirmed multiple times he did not want anything from plaintiff, except to remain on her health insurance for a period of time. Plaintiff agreed to keep defendant on her health insurance and delay filing for divorce to give him time to arrange for coverage of his own.

In the nearly three years following execution of the agreement, the parties abided by its terms, with neither seeking additional support or a share of assets not distributed in the agreement. Plaintiff assumed full responsibility for the mortgage payments and local property taxes associated with the former marital home. Defendant did not contribute to the expense of the younger child's education, which was borne solely by plaintiff. Plaintiff maintained health insurance coverage for defendant at her expense. The parties communicated only to discuss their children.

In 2017, plaintiff filed a complaint in the Family Part seeking to incorporate the PSA into a final judgment of divorce. Defendant filed an answer and counterclaim, seeking alimony and equitable distribution of marital assets. Plaintiff thereafter moved to enforce the PSA and for entry of a judgment of divorce incorporating the terms of the agreement. Defendant opposed the motion and cross-moved to invalidate the PSA.

Judge Deborah S. Hanlon-Schron held a plenary hearing on the matter. Both parties testified, as did plaintiff's cousin and defendant's brother.

On December 10, 2018, the judge issued a written opinion setting forth her findings of facts and conclusions of law. The court found defendant to lack credibility, characterizing his testimony as "continually attempting to feign

ignorance or lack of capacity . . . ." The judge did not accept defendant's testimony he was coerced into signing the agreement and suicidal on the day he signed the PSA, as "[h]e had never suffered from depression before that day and never suffered from depression after that date." She found his "testimony to be completely self-serving and incredible." The court also found "[i]t defies all common sense and logic that a person is only depressed and contemplating suicide for a limited number of hours on a specific day and was never in the same condition on any other day in the past or going forward."

On the other hand, the judge found plaintiff to be credible. She accepted plaintiff's testimony regarding the "circumstances which led to the transfer of the marital home and the preparation of the" PSA, and defendant's "position that the only thing that he wanted from the marriage was her medical insurance coverage." The court concluded defendant "repeatedly told [p]laintiff that the only thing that he wanted was to be covered under [p]laintiff's medical benefits . . . ."

In addition, the court rejected defendant's argument the PSA was invalid because it was obtained through duress. Specifically, the court concluded plaintiff "never called [defendant] twenty . . . to fifty . . . times a day" regarding the PSA.

6

Finally, the court found it was "satisfied by clear and convincing evidence that the PSA . . . represents the complete agreement of the parties[,]" who "made a conscious decision to exclude [d]efendant's business and [p]laintiff's pension from their agreement and to allow the parties to retain these assets themselves."

Having determined the PSA was enforceable, the court incorporated its terms into the January 7, 2019 final judgment of divorce.

This appeal followed. Defendant makes the following arguments for our consideration:

> POINT I
>
> THE COURT ERRED IN CONSTRUING THE DOCUMENT SIGNED BY THE PARTIES ON NOVEMBER 20, 2014 AS A VALID AND ENFORCEABLE PROPERTY SETTLEMENT AGREEMENT.
>
> POINT II
>
> THE PURPORTED PROPERTY SETTLEMENT AGREEMENT MUST BE SET ASIDE DUE TO ITS UNCONSCIONABLE RESULT AND BECAUSE ITS EXECUTION WAS THE PRODUCT OF DURESS AND COERCION.
>
> POINT III
>
> EVEN IF ENFORCEABLE AS TO ITS LIMITED STATED TERMS, THE PROPERTY SETTLEMENT AGREEMENT CANNOT BE CONSIDERED A COMPLETE AND FINAL RESOLUTION OF ALL

7

ISSUES AND A WAIVER OF EQUITABLE DISTRIBUTION OF OMITTED ASSETS.

POINT IV

THE COURT IMPROPERLY INTERPRETED THE EVIDENCE AND MADE FINDINGS BY IMPLICATION NOT BASED UPON THE ACTUAL TESTIMONY OF THE PARTIES.

II.

Our review of a Family Part's order is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e do not overturn those determinations unless the court abused its discretion, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super. 464, 479 (App. Div. 2004). We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters . . . ." Cesare, 154 N.J. at 413.

We must defer to the judge's factual determinations, so long as they are supported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). This court's "[a]ppellate review does not consist of weighing evidence anew and making independent factual findings; rather, [this court's] function is to determine whether there is adequate evidence to support the judgment rendered at trial."

A-2016-18T4

Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). We review de novo the court's legal conclusions. Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

In addition, this court "must give deference to those findings of the trial judge which are substantially influenced by his or her opportunity to hear and see the witnesses and have the 'feel' of the case, which [this court does] not enjoy upon appellate review." State ex rel. D.M., 451 N.J. Super. 415, 424 (App. Div. 2017) (quoting State ex rel. S.B., 333 N.J. Super. 236, 241 (App. Div. 2000)).

There must be "deference to the trial court's credibility determinations[,]" N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007), "because it 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" City Council v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

Additionally, settlement of matrimonial disputes is encouraged and highly valued in our court system. Quinn v. Quinn, 225 N.J. 34, 44 (2016) (citing Konzelman v. Konzelman, 158 N.J. 185, 193 (1999)). Settlement agreements are governed by basic contract principles and, as such, courts should discern and

implement the parties' intent. J.B. v. W.B., 215 N.J. 305, 326 (2013); Pacifico v. Pacifico, 190 N.J. 258, 266 (2007). "The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" Pacifico, 190 N.J. at 266.

"A narrow exception to the general rule of enforcing settlement agreements as the parties intended is the need to reform a settlement agreement due to 'unconscionability, fraud, or overreaching in the negotiations of the settlement[.]'" Quinn, 225 N.J. at 47 (quoting Miller v. Miller, 160 N.J. 408, 419 (1999) (alteration in original)). A contract is unconscionable if there is unfairness in the formation of the contract and if there are excessively disproportionate terms. Delta Funding Corp. v. Harris, 189 N.J. 28, 55 (2006). A contract is a result of duress when it was signed due to a "degree of constraint or danger, either actually inflicted or threatened and impending, sufficient in severity or in apprehension to overcome the mind or will of a person of ordinary firmness . . . ." Rubenstein v. Rubenstein, 20 N.J. 359, 365 (1956).

Having carefully reviewed defendant's arguments in light of the record and applicable legal principles, we are satisfied the record contains substantial credible evidence supporting Judge Hanlon-Schron's findings of fact. We also

agree with the judge's legal conclusions regarding the enforceability of the PSA. We therefore affirm the December 10, 2018 order enforcing the PSA and the January 7, 2019 final judgment of divorce incorporating the terms of the agreement for the reasons stated in Judge Hanlon-Schron's written opinion. We add the following comments.

The judge had an opportunity to observe the parties and their witnesses and to make determinations regarding their credibility. There is ample support in the record for the judge's determination that defendant knowingly waived his right to seek alimony in exchange for plaintiff not seeking distribution of defendant's business assets, foregoing support for the younger child, and agreeing to provide defendant's health insurance at her expense. As the trial court noted, defendant produced no evidence of coercion by plaintiff, apart from his self-serving testimony, which the judge found to lack credibility. In addition, it is undisputed that for nearly three years the parties operated under the PSA, with plaintiff bearing all the costs of maintaining the former marital home, educating the couple's youngest child, and providing defendant health insurance without objection or a request for support from defendant.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2016-18T4